# EXHIBIT C

# PHIL KLINKHARDT

12904 Crystal Avenue  •  Grandview, MO 64030  •  philklinkhardt@yahoo.com  •  816.718.8971

December 21, 2017

Ms. Hilary L. Hoskins
Case Manager
FDIC
1100 Walnut Street
Suite 2100
Kansas City, Missouri 64106

Mr. Jeff Maassens
Senior Bank Examiner
Missouri Division of Finance
PO Box 716
Jefferson City, Missouri

Dear Ms. Hoskins and Mr. Maassens:

Attached are responses to your letter of December 8, 2017, and updated Interagency Notice of Change in Control and Interagency Biographical and Financial Report for Justine Hurry to acquire 63.8% of the common shares of The Bank of Orrick, Orrick, Missouri (Bank). The major change in the Change in Control Notice is the removal of the ▮▮▮▮▮▮▮ equity injection, which is not appropriately a part of the change in control. While Mrs. Hurry intends to fund all or a portion of the equity injection to support the Bank's Strategic Plan, there is no assurance as to when or on what terms the Bank will offer shares of common stock. She will not be serving on the Bank's board. Any final determination of the offering and sale of stock will be dependent on the action of the board and, to the extent that the articles of incorporation/bylaws need to be amended to authorize additional shares, by shareholders, including Ms. Hurry.

## *Interagency Notice of Change in Control*

- The response to question 7 indicates that total purchase price is $▮▮▮▮▮▮▮; however, the source of funds is unclear. The SunTrust bank statement provided reports a balance of $▮▮▮▮▮▮▮ Furthermore, the SunTrust statement provides no identifiable information to conclude the funds are, in fact, Ms. Hurry's. Please provide adequate proof of available funds that clearly states the account owner and describe the source of cash.

With the change in application to reflect only the acquisition of the Clark's shares, the attached Exhibit A, proof of available funds, should meet your requirements. Also in this Exhibit is a letter from the Trust's attorney identifying that these funds are held for the benefit of Mrs. Hurry and are available for her investment use.

- The answer to question 11(d) indicates an equity offering will be held. Confirm that the change in the number of shares complies with the bank's articles of incorporation and bylaws. Additionally, provide the anticipated increase in Ms. Hurry's proposed ownership following the equity offering.

Upon approval of this application for Change in Control, Mrs. Hurry anticipates the Board of Directors will confirm the need for additional equity, request a valuation for the new common stock issuance, authorize sufficient shares to fund the equity injection and present any amendments to increase authorized shares to all shareholders for approval. Since the new common shares may be available to existing shareholders preemptively, Bank will contract for a valuation of the new equity issue. Thus, the price/value is not fixed at this date.

However, based on our experience, small banks/bank holding companies with earning histories similar to Bank's, often find these new shares valued at 50-75% of current equity. Assuming Mrs. Hurry

acquires all the new shares to be issued at a lesser price than the control block she initially acquires, her ownership would increase from 64% to approximately 76% if new shares are issued at 60% of current equity value per share.

- The response to question 12 indicates that Mike Graff will remain on the board of directors, but he is not currently a director. If the proponent intends to appoint Mr. Graff to the post-acquisition board, please provide information regarding Mr. Graff's experience and competence.

The FDIC and State have confirmed that Mike Graff is a duly appointed director.

- The response to question 12 also states Ms. Hurry intends to be a, "passive investor referring depositors and borrowers." Furthermore, your December 4, 2017, email states, in part, Ms. Hurry defines passivity as a limited degree of involvement. Expand on what Ms. Hurry's role will be (e.g. attending monthly committee meetings, board meetings, annual shareholder meetings, etc.). Also, based on Ms. Hurry's out-of-territory residence and business activity, it is reasonable to assume that some referred business will be out-of-market. Additionally, the Business Plan includes opening deposit accounts online. Please provide narrative regarding Bank Secrecy Act and Anti-Money Laundering Program enhancements to appropriately monitor these activities.

Mrs. Hurry views this investment similar to all of her investments. She will not be actively involved in day to day management of this investment. She will rely on reports from the Bank to gauge investment performance. She will attend annual meetings or provide proxy to management when satisfied with its performance.

The Bank currently runs all new accounts through Fiserv's Onboard Advisor which is included in the account opening software the Bank recently acquired. Onboard Advisor compares the parties to the new account with the OFAC List prior to account opening. The Bank uses a software product called Bridger to compare its customer list against the 314a list. Fiserv has available electronic protections in the online account opening process which comply with BSA and AML guidelines.

If the Bank realizes a demand for online account openings, Ms. Hurry has been advised that management will seek these online enhancements and upgrade its Internet banking product offerings.

- The Stock Purchase Agreement, in part, states there will be at least five directors at the time of closing. If a fifth member has not been appointed, one of the existing directors will remain on the board until the bank has appointed or elected an additional director(s). Please identify the existing director that will remain on the board, if another community member is not selected prior to regulatory response.

In response to this scenario, we anticipate that Scott Clark would remain until regulators acknowledge the replacement director.

## *Interagency Biographical and Financial Report*

- As discussed in the pre-filing meeting, because Ms. Hurry's financial statement includes jointly held assets (indicates at least real estate), add the signature on the certification section for the other owner of the assets.

The financial statements have been revised to reflect one half of the value of the assets held jointly with Mr. Hurry. Our experience has been that the FDIC and other banking agencies have found this approach acceptable in previous applications without requiring joint owners to become subject to the informational and other requirements of a change in control. Mrs. Hurry maintains her independence and has sufficient liquid assets to meet her commitments.

- Provide additional detail regarding the notes receivable from the Hurry Family Trust. Confirm the notes receivable current balances listed are only Ms. Hurry's beneficial interests.

These notes receivables were paid off since our earlier submission. No Notes Receivable are recorded on the 11/30/17 Financial Statement.

- Indicate source(s) of income as outlined on the earnings and cash flow section.

This is W-2 income received from Investment Services Holdings Corp., Stateline, Nevada.

- Confirm there are no contingent liabilities associated with the 46 affiliates listed.

Mrs. Hurry has no contingent liabilities with any of the 46 investments listed.

- Detail affiliate ownership percentages on question 4, and provide the corresponding trust documentation including controlling and beneficial interests as well as administrators.

Mrs. Hurry does not own any of the investments listed. The Hurry Family Revocable Trust owns BRICFM and WD Clearing, LLC. The other companies are not on her balance sheets. Mrs. Hurry has identified her association with these businesses, but she has no direct ownership. We believe that under these circumstances, the requested documentation would not be germane to the question of whether Mrs. Hurry is qualified to acquire control of the Bank and would cause undue burden and delay given that the deadline to acquire the Bank shares is March 31, 2018.

- The response to question 5(a)(4) notes Ms. Hurry previously expressed an interest in another institution. The related-business plan included an interest in broker-dealer transactions/clearings through deposit accounts and/or through the Deposit Trust Company with former target institution(s) as a participating member. Please address if similar activities are in the long-term plans for The Bank of Orrick.

Bank has no plans to apply for The Depository Trust & Clearing Corporation (DTCC) membership at this time. Management does not exclude the possibility of DTCC membership in the long term, but only as a depository for funds. There are no broker/dealer transactions contemplated.

- The information provided indicates Ms. Hurry and her spouse have partnered together for several prior business ventures. Please confirm the applicant intends to act alone in her proposed oversight of this institution.

This is Mrs. Hurry's investment and she will oversee it. Like any married couple she may discuss investments, but all investment decisions will be hers.

## *Other Exhibits*

- Page 3 of the Business Plan indicates there are two main strategies, which include: focusing on the current operating market, minimizing overhead and maximizing net income to share that income in the form of dividends with shareholders; and, the other strategy is to look at expansion opportunities.

  The forecasts provided do not reflect dividends. Please explain when, or under what circumstances, dividends would be expected. Also, provide additional detail regarding "intermediate-term" expansion opportunities, including potential geographic markets and facilities (e.g. branches, loan production offices, etc.).

Bank desires to build capital to support longer term organic growth as reflected in the 3 year business plan. This strategy is consistent with Mrs. Hurry's investment goals. When earnings are sufficient to support asset and deposit growth plans and shareholders can receive higher returns on cash than Bank retention of earnings can generate, dividends are anticipated.

Intermediate expansion plans are beyond the 3 year business plan submitted. At this time, these expansion plans are for a branch office in a growth area in the metropolitan area. Expansion is contingent on many unknown factors at this time, merely an option to spur earnings growth.

- Page 4 of the Strategic Plan lists the following products: "consumer loans, commercial loans both operating and capital purchase loans including commercial real estate, agricultural loans both operating and capital purchase loans including agricultural real estate, residential loans including single family, 1 to 4 family and multifamily properties both owner occupied and rental units, construction loans both residential and commercial, home equity lines of credit and all types of consumer loans." On page 24, action steps include, "<u>developing unconventional products such as bridge loans.</u>" Please discuss how the Loan Policy will be revised for the new products offered and the loan review function.

Ms. Hurry has been advised that the Board will modify the Loan Policy based on management's presentation of adequate procedures in place to maintain safe & sound banking practices. New products require appropriate risk management analysis to insure against undue risk. Standards for loan review will remain consistent with existing policy.

- Describe how existing staff would achieve and effectively oversee rapid loan growth as projected.

Existing staff will be augmented with an <u>additional experienced loan officer in the 2nd Quarter, 2019 as</u> shown in the Business Plan. Loans are projected to increase approximately $5 million annually. The current orientation for the President/CEO has been to gain an understanding of the loan portfolio and opportunities in the market. With additional equity raising the legal lending limit to $1 million, the Bank will be better positioned to book larger real estate loans; the President/CEO will more aggressively seek loans in the surrounding areas. <u>New ownership will generate loan opportunities and the new directors (Laughlin and Mountford) will bring in depth lending experience while generating referrals.</u>

- Page 4 also notes, "out of market deposits that we will have access to with the change in control are considered wholesale funding for this budget model." Confirm the brokered dollar amounts detailed on the *Budget Parameters* are the volume of out-of-market Hurry business-related deposits anticipated.

Management confirms that the out-of-market deposits in the plan are from business referred to the Bank by the new owner.

- The Plan notes the drive-through branch facility will be closed, and on page 5 it states management will "write off $100,000 of the book value of the branch and selling it for another $100,000. After 2019 we are projecting a savings of over $100,000 annually overhead and employee savings vs the costs of keeping the location open." Please provide supporting narrative for the accounting of this transaction if the facility will be written-off prior to selling and clarify the cost savings.

Management's analysis of the savings to be realized from the closure of the branch are attached as Exhibit B.

- The Business Plan also references products including mobile banking, bill pay, remote deposit capture, online account opening and loan applications, and money market investment accounts. Provide a detailed description of these products, how they will function, who will be responsible for ensuring compliance with the associated regulatory requirements, and the prior experience of the responsible individual(s) in managing these products.

Bank has already contracted with FiServ, the Bank's data processing vendor, for most of these products/services (mobile banking, bill pay, remote deposit capture). Staff is currently in training on this products with Bank introduction to customers in January 2018. Online deposit and loan applications are also available from FiServ. The President/CEO has many years of experience with this vendor relationship and is capable of efficient management of this vendor and its services consistent with Policy. The purchase of online applications will be analyzed for cost benefit, risk and alternatives before presentation to the Board of Directors for its decision. Exhibit C, the new policy drafted for Board approval on managing Electronic Banking Risk Management, is attached.

- Please provide an Information Technology Plan that details actionable steps to achieve IT efficiencies noted in the Business Plan as the bank currently lacks several of the communicated capabilities. Additionally, please ensure/confirm the associated costs are incorporated in the projections provided.

The IT efficiencies noted in the Strategic Plan are installed and currently available with the exception of the updated web site. Bank will begin an active marketing campaign in early 2018 to increase customer usage of the new online products. The associated costs have been accounted for in the budget models.

- Please describe the fee opportunities, associated with new ownership, that are not typically found in your market as outlined on page 7.

The most likely opportunity will come from increased service charge fees on corporate accounts. Related revenue increases will come from higher loan commitment fees for lines of credit and bridge loans.

- On page 6, a deferred tax asset (DTA) is noted and anticipated to be realized at a later date. Provide supporting narrative for maintaining the DTA following the proposed transaction.

Since this is a common stock sale, not a corporate reorganization, deferred tax assets remain available for use. Bank has visited with its accountant who stated that based on the facts provided he believes the sale of individual shareholders' common stock should have no effect on the Bank's asset structure.

- Provide Tier 1 Leverage Capital projections over the next three years, and confirm that the calculations and terminology are consistent with the capital ratios required under Part 324 of the FDIC's Rules and Regulations.

Part 324 identifies Tier 1 Leverage Capital Equity less unrealized securities gains and core deposit intangibles divided by average assets. Management's goal is to maintain this ratio in excess of 8%. The Tier 1 Leverage Ratio at the end of each quarter assuming a constant $311,000 intangible asset for the Deferred Tax Asset being deducted from regulatory capital along with the estimated securities adjustments shown in the plan results in the following Tier 1 Leverage positions:

|  | Total Assets (000 omitted) | Average Assets | Equity (000 omitted) | Tier 1 Leverage Ratio |
| --- | --- | --- | --- | --- |
| 9/30/17 | $ 32,964 | $ 33,001 | $ 3,332 | 9.06% |
| 12/31/17 | 32,695 | 32,830 | 3,332 | 9.11% |
| 3/31/18 | 33,699 | 33,197 | 3,333 | 8.98% |
| 6/30/18 | 34,679 | 34,189 | 3,343 | 8.73% |
| 9/30/18 | 37,212 | 35,946 | 4,374 | 11.14% |
| 12/31/18 | 39,463 | 38,338 | 4,443 | 10.60% |
| 3/31/19 | 41,193 | 40,328 | 4,510 | 10.22% |
| 6/30/19 | 42,939 | 42,066 | 4,593 | 9.98% |
| 9/30/19 | 44,702 | 43,821 | 4,692 | 9.79% |
| 12/31/19 | 46,505 | 45,604 | 4,832 | 9.69% |
| 3/31/20 | 48,384 | 47,445 | 4,948 | 9.55% |
| 6/30/20 | 50,307 | 49,346 | 5,108 | 9.48% |
| 9/30/20 | 52,234 | 51,271 | 5,272 | 9.43% |
| 12/31/20 | 54,184 | 53,209 | 5,458 | 9.42% |

- Financial projections reflect significant loan growth annually; however, the allowance for loan and lease losses (ALLL) appears to only increase nominally. Please provide additional support for the ALLL assumptions.

According to the Uniform Bank Performance Report of 9/30/17, the current ALLL as a percent of Total Loans was at 1.81%, 20% higher than the 1.50% average maintained at Peer Banks. Bank's management believes that improved loan underwriting will maintain loan performance below its average historical 90 day past dues rates which have been significantly below Peer's 1.0% average. Management is forecasting the ALLL will remain above Peer averages in 2018 at 1.70% of total loans before dipping to 1.41% in 2019 and then 1.28% in 2020. Given the positive past due performance, the strong capital position and Board/management attention to quality lending, management is comfortable with forecasted allocations.

We further note forthcoming changes to ALLL allocations. CECL's forward looking analysis may require changes to allocations. Management will be prepared to request additional allocations if adoption of CECL requires larger allocations.

- Explain the increase in premises and fixed assets in the 2020 forecast.

The 2020 forecast reflects remodeling of the existing banking facilities to improve efficiency. These efficiencies are envisioned from changes in layout and upgrading equipment.

- Revise financial assumptions and projections where appropriate to be consistent with your responses to the above information and incorporate the current tax rate.

No revision is necessary. As stated in the Strategic Plan on page 6,

> In the budget models included with this plan, we are anticipating a tax rate of 25%. As this plan is written the corporate rate is 35% but congress is promising a tax reform package perhaps later this year. At this time they are promising a corporate tax rate of 20% but that is far from settled. The bank has a deferred tax asset of over $375,000 and based on the earnings projections in this model it will be 2021 before we would be in a position to pay any taxes at a projected rate of 25%. If the tax reform package fails to be passed and we continue with current tax rates we will be in a position to owe taxes sooner and the retained earnings position will be less that what is projected in the model

Since the existing tax loss carryforwards will offset net earnings through 2020, no revisions for taxes appear necessary especially since Congress has approved a corporate income tax rate of 20%.

- The Plan notes the bank's primary market areas are the City of Orrick, Ray County and adjoining counties (Carroll, Caldwell, Clay, Clinton, Jackson, and Lafayette Counties) on page 7. The 2015 Community Reinvestment Act (CRA) evaluation indicated that the bank's defined assessment area was all of Ray County, Missouri. Please confirm whether the intent is to expand the defined assessment area to seven counties for CRA purposes.

The CRA defined assessment area will remain Ray County until a majority of business originates outside Ray County. We assume that the future defined assessment area will be the Kansas City Metropolitan Area, but until significant business expands beyond traditional boundaries, we view the defined assessment area remaining to be Ray County.

- The Plan notes staff, management, and the directorate will receive ABA training. Please clarify if Ms. Hurry will receive any training, and if so, please describe the training.

Since Mrs. Hurry has no plans to serve as an officer or director of the Bank, no plans have been developed for any training. Please note that she has 20 years of experience in finance, is a successful investor in the financial industry and is a Certified Bank Secrecy Act Officer – II (CBO-II) which requires 12 hours of AML continuing education annually. This advanced level II program covers the evolving role of a compliance officer including international standards, foreign corrupt practices, due diligence and enhanced due diligence. However, if you recommend an education program she will pursue it.

- Clarification of the business combination accounting election for the transaction (i.e. opting-in or -out of pushdown accounting) and narrative to support the selection.

Push-down accounting is about allocating costs between a parent company and its subsidiaries. There is no parent company involved in this transfer of common stock from one individual to another.

Privately held companies are not required to use push-down accounting in any circumstances. Moreover, since this transaction involves individuals acquiring the stock from other individuals, push-down accounting does not apply.

Bank has conferred with its accountant on this matter who shared a similar conclusion.

- Detail all the bank boards Mr. Mountford and Mr. Laughlin currently serve on, as well as any outstanding consulting engagements with other institutions.

Max Mountford is not a director of any bank or bank holding company currently. He will become a director of Bison State Bank, Bison, Kansas, when that bank's sale is finalized in January 2018. Mr. Mountford anticipates being retained for loan review at Bison State Bank. He has no other long term bank consulting commitments, but his firm, Special Asset Management Group, LLC, engages in projects as presented.

Michael Laughlin is not a director of any bank or bank holding company. His consulting firm, Laughlin Consulting, is currently retained by Hometown Bank, Carthage, Missouri, consulting on problem loans and OREO. This is an open contract. Michael has no other long term consulting agreement, remaining available for other consulting assignments.

This month Springfield, Missouri-based Guaranty Federal Bancshares, Inc. and Hometown Bancshares, Inc. jointly announced that they have executed a definitive Agreement and Plan of Merger providing for the merger of Hometown with and into Guaranty.

- Explain anticipated changes to the various committee structures.

Management has no plans for adding any new committees. The only changes to the committee structure will be the change in directors appointed resulting from election of new directors.

- Describe potential changes to the audit program under new ownership and as new products and services are offered.

No material changes to the audit program are planned under new ownership. Currently, the Fullenwider Firm in Liberty does the Bank's Directors Audit, ALCO /IRR review, Loan Review, and prepares our taxes. 10D Security does the IT audit. The Bank utilizes the Missouri Bankers Association for Compliance review and BSA/AML review.

- Provide publication affidavits for the notice of the transaction, as available.

An Affidavit of Publication will be forthcoming from the Richmond Times, the primary newspaper of general circulation in Ray County, verifying publication on December 22, 2017.

Enclosed with these responses are the Interagency Biographical & Financial Report along with the Interagency Notice of Change in Control. We look forward to a favorable response in the near future.

Happy Holidays,


Phil Klinkhardt

Exhibit A
Proof of Funds

*Nummi & Associates*
A Professional Association – Founded in 2005

Richard M. Nummi, Esq.
213 49th Avenue North, Ste 100
Saint Petersburg, FL 33703
P: (813) 727-3673
F: (813) 435-2210
E: rnummi@mac.com

Date: 12/19/17

To whom it may concern:

Mr. and Mrs. Hurry currently maintain a trust balance of approximately  dollars with our firm. This amount is unencumbered by any current obligation and is withdrawable at any time for any purpose. If you have any further questions or concerns, please don't hesitate to contact me directly.

Sincerely,

Richard M. Nummi, Esq.
Managing Partner

10301 Abbotsford Drive, Tampa Florida 33626 – 813.727.3673

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

Page 1 of 1

10/31/2017

# SUNTRUST

# Account Statement

NUMMI AND ASSOCIATES AGENT FOR
TRUST ACCOUNT IOTA
213 49TH AVE N
SAINT PETERSBURG FL 33703-3925

Questions? Please call
1-800-786-8787

**Important: Fee Changes.**
SunTrust Bank completed an annual review of treasury and payment services pricing.
As of January 1, 2018, fees will change for some treasury and payment services,
including fees for certain ACH, wire transfer, cash vault, lockbox, and online services.
Additional detail will be available in your next statement.

## Account Summary

| Account Type | Account Number | Statement Period |
|---|---|---|
| INTEREST ON LAWYERS TRUST | | 10/01/2017 - 10/31/2017 |

| Description | Amount | Description | Amount |
|---|---|---|---|
| Beginning Balance | $ | Average Balance | $ |
| Deposits/Credits | | Average Collected Balance | $ |
| Checks | | Number of Days in Statement Period | |
| Withdrawals/Debits | | Annual Percentage Yield Earned | |
| Ending Balance | $ | Interest Paid Year to Date | |

## Deposits/Credits

| Date | Amount | Serial # | Description |
|---|---|---|---|
| 10/31 | | | INTEREST PAID THIS STATEMENT THRU 10/31 |

Deposits/Credits: 1     Total Items Deposited: 0

## Withdrawals/Debits

| Date Paid | Amount | Serial # | Description |
|---|---|---|---|
| 10/02 | | | PREVIOUS MONTH'S IOLTA INTEREST |

Withdrawals/Debits: 1

## Balance Activity History

| Date | Balance | Collected Balance | Date | Balance | Collected Balance |
|---|---|---|---|---|---|
| 10/01 | | | 10/31 | | |
| 10/02 | | | | | |

The Ending Daily Balances provided do not reflect pending transactions or holds that may have been outstanding when your transactions posted that day. If your available balance wasn't sufficient when transactions posted, fees may have been assessed.

266899                                    Member FDIC