# EXHIBIT D

KCM 1/12/2018



**Federal Deposit Insurance Corporation**
1100 Walnut Street, Suite 2100
Kansas City, Missouri 64106

Division of Risk Management Supervision
Kansas City Regional Office
(816) 234-8000

January 12, 2018

Mr. W. Phillip Klinkhardt, Jr.
Consultant
12904 Crystal Avenue
Grandview, Missouri 64030

Subject:   Notice of Change in Control (Notice)
           Ms. Justine Hurry
           The Bank of Orrick, Orrick, Missouri

Dear Mr. Klinkhardt:

The Kansas City Regional Office of the FDIC is returning the Notice that we received on December 22, 2017. The Notice is incomplete and insufficient for the FDIC's consideration. Pursuant to 12 U.S.C. §1817(j), a Notice shall contain, among other things:

- The identity, personal history, business background and history of each person by whom, or on whose behalf the acquisition is to be made, including material business activities and affiliations;
- A statement of the assets and liabilities of each person by whom or on whose behalf the acquisition is to be made, together with related statements or income and source and applications of funds, all prepared in accordance with generally accepted accounting principles;
- The terms and conditions of the proposed acquisition;
- The identity, source, and amount of funds to be used in making the acquisition, and if any of these funds are to be borrowed or otherwise obtained, a description of the transaction, the names of the parties to the transaction, and any arrangements, agreements, or understandings with such persons;
- Any plans which an acquiring party may have to make a major change in its business or management; and,
- Any additional relevant information as the appropriate Federal banking agency (the FDIC in this matter) may specifically request.

The FDIC may disapprove a Notice, if among other things, the acquirer neglects, fails, or refuses to furnish to the FDIC all information required by the FDIC. (12 USC 1817(j)(7)(e))

The Kansas City Regional Office has provided you on numerous occasions, both verbally and in writing, the information that is necessary for the Notice to be considered complete. A "pre-filing" meeting was held with Ms. Justine Hurry, the proposed acquirer of the Bank, and you on October 10, 2017. During the meeting we discussed the application process, outlined the statutory factors, and provided initial feedback on a Notice that you were preparing.

On November 29, 2017, we received a Notice from you and later returned it because the information was incomplete and inadequate. We detailed the items needed to evaluate the proposal, if the proponent elected to resubmit the Notice, in a letter dated December 8, 2017.

On December 22, 2017, we received your latest Notice. Many of the items we outlined in our December 8, 2017, letter remain unaddressed or lack sufficient information and explanation. As a result, your latest Notice is incomplete and we are unable to process it as submitted. Therefore, we are returning those documents to you again.

If Ms. Hurry resubmits the Notice, it must be complete and accurate. In particular, we will need additional information to evaluate the proposal adequately. Notably, many of these items were identified and discussed during the pre-filing meeting and expressly outlined in our letter dated December 8, 2017, responding to the initial filing. Nevertheless, additional detail is provided below to further clarify incomplete items. The indicated items are listed in the order which they arise in the respective documents.

*FDIC Response Letter*

Your attachment entitled *FDIC Response Letter (Response)*, dated December 21, 2017, states the only major change in the Notice is the removal of the $▮ equity injection. The *Response* further states that Ms. Hurry intends to fund all or a portion of the equity injection, but "there is no assurance as to when or on what terms the bank will offer shares of common stock."

The lack of assurance regarding an equity injection suggests a significant change in the expressed business plan. The need for an equity injection to grow and bolster earnings is reiterated throughout the Notice. For example, in the October 29, 2017, letter from Ms. Hurry's attorney (attachment with the Notice), it states, "the bank is unprofitable and in need of capital in order to succeed." However, the financial statement provided indicates Ms. Hurry does not have the financial wherewithal to inject additional equity. Nonetheless, the three-year plan and financial projections submitted were not revised and include a $▮ injection immediately following the change in control. Please address the capital injection discrepancy, whether Ms. Hurry intends to make a significant capital injection, and identify the source of any injections.

*Interagency Notice of Change in Control*
The initial requested item is detailed below and followed by the response you provided. Further clarification of the missing information is also included in the sub-bullets.

- The response to question 7 indicates that total purchase price is $▮, however, the source of funds remains unidentified.

    o The SunTrust bank statement provided with your *Response* reports a balance of $▮, however, the statement lacks any personally identifiable information to conclude the funds are, in fact, Ms. Hurry's. Please provide adequate proof of available funds that clearly states the account owner and describes the source of cash.

    o In addition, Exhibit A attached to your *Response* includes a letter from Mr. Richard M. Nummi, Managing Partner of Nummi & Associates, which states, in part, "Mr. and Mrs.

Hurry maintain a trust balance of $███████." That does not provide any information regarding Ms. Hurry's right and access to the trust funds. Please provide the related trust documents, and an explanation of Ms. Hurry's right and access to the trust funds.

- The response to question 11(d) indicates an equity offering will be held. Your *Response* confirmed that the proposed board will change the number of shares to comply with the bank's articles of incorporation and bylaws. It was also noted that a market valuation will be completed prior to the new offering. Please provide an anticipated timeline for this process as projections indicate an equity injection in the third quarter of 2018.

- Your response to question 12 states Ms. Hurry intends to be a "passive investor referring depositors and borrowers." Furthermore, your December 4, 2017, email to our office states, in part, Ms. Hurry defines passivity as a limited degree of involvement. We requested you expand on what Ms. Hurry's role will be (e.g. attending monthly committee meetings, board meetings, annual shareholder meetings, etc.).

    o Your *Response* states Ms. Hurry will view this investment similar to all of her investments; however, it is unclear how those investments are directed (e.g. trust documentation and extent of Mr. Hurry's involvement). Please expand on Ms. Hurry's role.

    o The information provided about Ms. Hurry's business experience is conflicting. When addressing her business experience in the response, Ms. Hurry states that she is an indirect owner of two profitable and successful brokerage firms. However, in other sections of the Notice, Ms. Hurry states she has no operational or supervisory oversight of the same said firms despite serving as a director. Please address Ms. Hurry's relationship with the associated businesses, including an explanation of her direct or indirect ownership and her roles therein.

*Interagency Biographical and Financial Report (IBFR)*

- Your response to question 2 states Ms. Hurry is an owner of Investment Services Holdings Corp., Stateline, Nevada. However, in response to question 4, Ms. Hurry states she does not own any of the investments listed below, which includes Investment Services Holding Corp. This entity is also identified as the sole source of income for Ms. Hurry. The Nevada Secretary of State database reflects Mr. John Hurry as the President, Secretary, Treasurer, and Director with no reference to Ms. Hurry. Please clarify if the source of income is to Ms. Hurry or the Hurry Family Trust. Also, please explain Ms. Hurry's role with Investment Services Holding Corp., including an explanation of her direct or indirect ownership.

- As noted above, Ms. Hurry's ownership of any associated business is relevant and material to her ownership and operation of the bank. Please detail the ownership percentages of the businesses listed in response to question 4. The IBFR instructions define a principal shareholder or owner as a person who directly or *indirectly* owns, controls, or holds (either individually or as a member of a group) the power to vote 10 percent or more of equity interest of an entity. Furthermore, the Business Plan included with the Notice states Ms. Hurry's associated business accounts will be

moved to the subject institution.

- o Affiliate relationships and related interests of bank insiders are closely monitored and regulated. See, e.g., Sections 23A and 23B of the Federal Reserve Act, and Federal Reserve Regulation O.

- Provide the corresponding trust documentation, referenced in the response to question 4, including controlling and beneficial interests, administrators, and trustees. The financial statement contains trust assets (at least BRICFM LLC-DBA Corner of Paradise and cash) and income derived from indirectly owned entities (at least Investment Services Holdings Corp). This documentation is pertinent to the assessment due to the closely related nature of the trust, business affiliations, and Ms. Hurry's financial capacity to complete the proposed transaction.

- The response to question 5(a)(4) notes Ms. Hurry previously expressed an interest in another institution. The related-business plan included an interest in broker-dealer transactions/clearings through deposit accounts and/or through the Deposit Trust Company (DTC) with former target institution(s) as a participating member. Please address if similar activities are in Ms. Hurry's long-term plans for The Bank of Orrick.

    - o The *Response* indicates the bank/management have no immediate plans to apply for the DTC. It is not unreasonable to conclude that Ms. Hurry has an interest in conducting broker-dealer transactions/clearings. Accordingly, please address Ms. Hurry's long-term vision of the bank's activities and footprint as the proposed principal shareholder. Please provide Ms. Hurry's response to this item.

- The response to question 6, in part, states, "The Hurrys have a history of making financial services firms successful. She, with her husband, is the indirect owner of two profitable securities broker/dealers...through irrevocable trusts." Furthermore, your *Response* states that Ms. Hurry would likely discuss her bank investment with Mr. Hurry as any married couple would. Please state what, if any, involvement Mr. Hurry would have with the bank, including any direct or indirect control over the institution. Additionally, clarify if the bank stock will be held in a trust account for Ms. Hurry, and if so, who else will be a beneficiary of the trust.

- The response to question 6 also states Ms. Hurry will inject additional equity into the bank to support additional staff and complete the turnaround of the bank. As noted above, Ms. Hurry's financial statement does not show the capacity to provide the equity injection referenced throughout the Notice. Please address this discrepancy.

- Because Ms. Hurry's financial statement includes jointly held assets (indicates at least real estate and cash balances), the certification needs to be signed by the other owner of the assets. This was previously discussed at the pre-filing meeting and detailed in our prior letter.

    - o Your *Response* states that Ms. Hurry's financial statement was revised to reflect half of the value of the assets jointly held with Mr. Hurry (spouse). The Response further states Ms. Hurry maintains her independence and has sufficient liquid assets to meet her commitments.

- o The financial statement provided includes jointly held assets. Although the values have been reduced by half in the subject Notice, because assets are jointly held the other owner of those assets should sign the certification section as instructed on the IBFR form.

- o Although you have added a disclaimer to the financial statement, the statement should still be prepared in accordance with generally accepted accounting principles (GAAP), as mandated in 12 U.S.C. §1817(j)(6)(b). Please ensure any future submissions are prepared in accordance with GAAP.

- o If the proponent elects to resubmit, the IBFR should be signed and dated after reviewing (i.e. do not use the same certification dated November 12, 2017).

*Business Plan and Financial Projections*

- Page 3 of the Business Plan indicates there are two main strategies: (1) focusing on the current operating market, minimizing overhead and maximizing net income to share that income in the form of dividends with shareholders, and (2) look at expansion opportunities. We requested you provide additional detail regarding "intermediate-term" expansion opportunities, including potential geographic markets and facilities (e.g. branches, loan production offices, etc.).

    - o Your *Response* stated intermediate expansion plans include a branch in a growth area in the metropolitan area. Please identify the metropolitan area Ms. Hurry is considering.

- Describe how existing staff would achieve and effectively oversee projected loan growth.

    - o Your *Response* states the additional equity raises the legal lending limit to allow for larger loans. However, it is unclear if the additional equity is possible. Additionally, you note referrals are expected from the new members of the directorate; however, both individuals are also engaged by other institutions, which may limit leads. Please address if the anticipated growth is attainable without the $[redacted] injection prior to resubmitting.

- Your *Response* confirmed the brokered dollar amounts detailed on the *Budget Parameters* are the anticipated volume of out-of-market, Hurry business-related deposits. Additionally, you noted the fee opportunities associated with new ownership were largely service charge fees and related revenue from higher loan commitment fees for lines of credit and bridge loans.

    - o Please expand on the anticipated volume of deposits/transactions for the various Hurry business-related deposits.

    - o Describe potential changes to the audit program to encompass affiliate relationships.

- The Plan notes the drive-through branch facility will be closed, and on page 5 it states management will "write off $100,000 of the book value of the branch and selling it for another $100,000. After 2019 we are projecting a savings of over $100,000 annually overhead and employee savings vs the costs of keeping the location open."

- o Please provide additional support for the basis of the proposed $100,000 write-down. Also, please ensure this write-down is included in the financial projections.

- o Your *Response* details the cost savings from the branch closure as requested (Exhibit B), which includes $49,000 related to employee costs. However, page 89 of the Business Plan states branch employees will be retained; therefore, it appears the cost savings are overstated. Please make adjustments as needed.

- The Business Plan also references products including mobile banking, bill pay, remote deposit capture, online account opening and loan applications, and money market investment accounts. Provide a detailed description of these products, how they will function, who will be responsible for ensuring compliance with the associated regulatory requirements, and the prior experience of the responsible individual(s) in managing these products.

    - o Please describe the money market investment account.

    - o Your *Response* indicates President Ayers has many years of experience with Fiserv (vendor). Please describe his experience in detailed.

    - o It appears President Ayers role is expanding with more out-of-office lending calls, overseeing BSA and AML compliance, and the above technology applications. Please detail all of President Ayers' anticipated duties.

- Financial projections reflect significant loan growth annually; however, the allowance for loan and lease losses (ALLL) only increases nominally. We requested that you provide support that the projected ALLL level is appropriately funded.

    - o Your *Response* cites the bank's elevated ALLL level in relation to the peer group average as support for the nominal increase. However, loan portfolios vary considerably from bank-to-bank based on geographic location, types of loans, and management expertise. As a result of these variances, the peer group average in this particular category is less meaningful. Please provide additional support for the ALLL assumptions incorporated in the Business Plan for The Bank of Orrick.

- Explain the increase in premises and fixed assets in the 2020 forecast.

    - o The *Response* states that the bank will be remodeled to improve efficiencies; however, it does not detail the projected increase in fixed assets of $425,000. Please describe anticipated changes (beyond cash recyclers) and discuss the anticipated accounting for the transaction.

- Revise financial assumptions and projections where appropriate to be consistent with your responses to the above information.

    - o You did not make any revisions to the financial projections. Please revise projections to address the inconsistencies noted above including the equity injection, employee cost savings, and potentially the ALLL.

- o The lower tax rate does not need to be revised as the new tax bill was signed; however, the impact of the lower tax rate to the deferred tax asset (DTA) should be incorporated in the projections, if you elect to resubmit the Notice.

- o Revisit the Tier 1 Leverage Capital projections over the next three years, and confirm that the calculations and terminology are consistent with the capital ratios required under Part 324 of the FDIC's Rules and Regulations, if any adjustments are needed following the DTA assessment.

If the proponent intends to resubmit, please publish again and provide an affidavit of publication as it becomes available.

The statutory factors required to be favorably resolved for this Notice include assessing the proponent's competence, experience and integrity. Failure to provide missing information needed to adequately evaluate the proposal does not reflect favorably on the proponent. Please ensure any future filings provide adequate information to evaluate the proposal.

You may direct any questions to Case Manager Hilary L. Hoskins, Assistant Regional Director Richard E. Allen or me at (816) 234-8000.

Sincerely,

John R. Jilovec
Deputy Regional Director

Enclosures

Cc: Jeff Maassen, Missouri Division of Finance, Jefferson City, Missouri
    Justine Hurry, Phoenix, Arizona
    David Baris, Washington, D.C.
    Board of Directors, The Bank of Orrick, Orrick, Missouri