**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JUSTINE HURRY**

               Plaintiff,

   v.

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION, et al.**

               Defendants.

C.A. No. 1:18-cv-2435

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**Table of Authorities**

**Cases**

*3Q Digit., Inc. v. U.S. Citizenship & Immigration Servs., No.* 1:19-cv-579-RCL, 2020 U.S. Dist. LEXIS 39558, at *16 (D.D.C. Mar. 6, 2020)..................................................................................... 13

*AFL-CIO v. NLRB*, 2020 U.S.Dist. LEXIS 115857 (D.D.C. July 1, 2020) ....................................... 22

*American Hospital Asso. v. Azar,* 2020 U.S. Dist. LEXIS 110130 at *15 (D.C. June 23, 2020)   12-13

*Department of Homeland Security et al. v. Regents of the University of California,*
No. 18-587 (June 22, 2020) .......................................................................................... 12, 14

*Friedman v. FAA*, 841 F.3d 537 (D.C. Cir. 2016) ..................................................................... 19, 21

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ................................................................................. 12-14

*Overdevest Nurseries LP v. Scalia*, 2020 U.S. Dist LEXIS 66292 at *13
(D.D.C. April 15, 2020) ................................................................................................ 12-13

*Stuttering Found. of Am. v. Springer,* 498 F.Supp. 2d 203, 207 (D.D.C. 2007) ............................. 19

*Select Specialty Hosps., Inc. v. Azar,*  No. 19-2591 (BAH),
2020 U.S. Dist. LEXIS 924, at (D.D.C. May 26, 2020) .................................................. 19

*Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006) ....................................................... 12

**Statutes and Regulations**

12 C.F.R. § 303.11 .................................................................................................. 11, 15-16, 19

12 C.F.R. § 303.86 ...........................................................................................................17

12 C.F.R. § 308.110 ...........................................................................................................15

Administrative Procedure Act, § 706 ................................................................................ Passim

Change in Bank Control Act, 12 U.S.C. §1817 et seq................................................................. Passim

## Table of Contents

Preliminary Statement ...................................................................................................... 1

Statement of Facts

    1.  The FDIC Did Not Disapprove the Notice or Seek Extensions of Time to Do So............ 2

    2.  The FDIC's January 2018 Repetitive, Irrelevant and Improper Requests
       for Information.......................................................................................................... 5

    3.  The FDIC's Continued Requests for Information Regarding Available Funds and Trust
       Entities .................................................................................................................... 6

ARGUMENT

    I.    BECAUSE THE FDIC FAILED TO DISAPPROVE THE TRANSACTION IN
        ACCORDANCE WITH THE STATUTE, THE TRANSACTION
        MAY PROCEED ......................................................................................................... 12

      A.  Applicable Law ...................................................................................................... 12

      B.  The FDIC Failed to Disapprove the Notice In Accordance With The Statute ................. 15

      C.  The FDIC Failed to Take Any Action Within the Time Prescribed by Statute and So Its
         Subsequent Action is Invalid .................................................................................. 16

      D.  The FDIC's Excuses are Unsupported by the Administrative Record and Baseless........ 17

         1.  The Notice Was Submitted in Accordance with the Provisions of the Statute and the
            Applicant Was Entitled to Consideration of the Notice............................................. 17

         2.  The FDIC Cannot Circumvent Statutory Procedures By Authorizing Itself to Deem a
            File "Abandoned" ................................................................................................ 19

         3.  The FDIC Itself Confirmed that 12 U.S.C. §1817(j)(7)(E) Applies to the
            Circumstance Where Information is Not Provided.................................................... 21

    II.   THE FDIC'S FAILURE TO CONSIDER AND THE "CLOSURE" OF THE FILE
        WERE ARBITRARY AND CAPRICIOUS.................................................................... 22

CONCLUSION................................................................................................................ 25

**Preliminary Statement**

By this motion, Plaintiff seeks judgment on the three causes of action set forth in the Amended Complaint based on the failure of the Federal Deposit Insurance Corporation ("FDIC") to take lawful action in relation to the Notice of Change in Bank Control ("Notice") submitted by Plaintiff pursuant to the Change in Bank Control Act ("CBCA"), 12 U.S.C. § 1817 et seq.. As an initial matter, it is undisputed that the FDIC did not disapprove the Notice within the time prescribed in the statute.  For that reason alone, judgment should be entered on Plaintiff's first cause of action and a declaratory judgment issued confirming that the transaction may proceed.

The FDIC does not even claim that it acted in accordance with the specific provisions and procedures contained in the CBCA, arguing instead that it empowered itself to take actions inconsistent with that specific statutory language.  It claims, first, that it can decide that a Notice is "incomplete" and so never be obligated to assess it, notwithstanding the fact that the Notice was submitted in the prescribed format and contained the information called for by the statute.  It claims also that it can deem that Notice "abandoned," thereby depriving the applicant of the appeal process contained within the CBCA.  Because the agency's actions are contrary to the plain language of the statute, they contravene §706 of the Administrative Procedure Act ("APA") and plaintiff is entitled to judgment in her favor on her Second Cause of Action.

Finally, even if the FDIC could empower itself to take the actions which are not authorized by the relevant statute, its actions were arbitrary and capricious, discriminatory and invalid.  Again, because it failed to take valid action in the manner and within the time prescribed by statute, the plaintiff is entitled to judgment and the transaction may proceed.

## Statement of Facts

### 1.   The FDIC Did Not Disapprove the Notice or Seek Extensions of Time to Do So

Plaintiff filed the Notice on November 17, 2017 on the forms prescribed by the FDIC ("Interagency Notice of Change in Control," Form No. 3064-0019; "Interagency Biographical and Financial Report," Form No. 3064-0006).  Plaintiff's Rule 56.1 Statement of Material Facts Not in Dispute ("Rule 56.1") at ¶1; Exhibit A to Rule 56.1: Interagency Notice of Change in Control; Exhibit B to Rule 56.1: Interagency Biographical and Financial Report.  In accordance with §1817(j)(6) of the CBCA, that Notice addressed each of the required items of information:

 a. the identity, personal history, business background and experience of the person by whom the acquisition is to be made and any material pending legal or administrative proceedings to which she is a party, including any criminal indictment or convictions;

 b. a statement of the assets and liabilities of the person by whom the acquisition is to be made for a period covering the immediately preceding five fiscal years, and including statements of income and source and application of funds for each such year;

 c. terms and conditions of the proposed acquisition, including the manner in which it is to be made;

 d. the identity, source, and amount of funds or other consideration to be used in making the acquisition, and the extent to which any part of such consideration has been borrowed;

 e. any plans to liquidate the bank, sell its assets, merge it with any company, or make any other change in its business or corporate structure or management;

 f. identity of any persons employed or to be compensated by the acquiring person to solicit or recommend stockholders concerning the acquisition;

 g. copies of any tenders or advertisements making a tender offer to stockholders in connection with the proposed acquisition.

2

Rule 56.1 at ¶¶ 1-2.

The Notice set forth: (i) how Mrs. Hurry came to learn about and be involved in the acquisition of the Clarks' control block of the Bank; (ii) her background and employment and business experience, including information related to her business associations and activities in the financial industry; (iii) a detailed financial statement indicating the availability and source of funds that she intended to use to complete the acquisition; (iv) plans and projections affecting the Bank; (v) anticipated changes to the Board of Directors in light of the Clarks' resignations and information concerning proposed Board members; and (vi) information concerning Mrs. Hurry's limited anticipated role with the Bank following the acquisition.  Rule 56.1 at ¶ 2 and Exhibit B: Interagency Biographical and Financial Report.

The Notice included all the information called for by the statute and the Interagency Biographical and Financial Report. Exhibit B to Rule 56.1 at 2-15.  That biographical information included Mrs. Hurry's actual employment for the prior five years at certain firms and disclosed even historical issues that had arisen in relation to those firms. *Id.* at 3, 7-8.  Separately, under the category of business "associations," it provided a list of entities including those in which she held only an indirect interest by virtue of being a beneficiary of certain *irrevocable* family trusts.  *Id.* at 1-2 at 4.  It confirmed that the acquisition would be made with cash and, in accordance with the instructions contained in the form, provided the bank statement verifying the availability of the funds and a financial statement which plainly evinced Mrs. Hurry's financial capability to complete the transaction.  *Id.* at 3, 9-14.

On or about December 8, 2017, the FDIC sought additional information about Mrs. Hurry's ownership of the available funds, her anticipated role in the Bank, the nature and extent of assets reflected on financial statements that were held jointly with her husband, information concerning the Hurry Family Revocable Trust, the extent of *Mr. Hurry's role* in the acquisition, and specific aspects

of the business plans and financial projections for the Bank itself.  Rule 56.1 at ¶ 4 and Exhibit C: Dec. 21, 2017 Letter from Klinkhardt to FDIC.

Phil Klinkhardt, on behalf of Mrs. Hurry, responded to this request on December 21, 2017, providing substantial additional information relating to the Notice and the Interagency Biographical and Financial Report.  *Id*. Mr. Klinkhardt's letter explained in detail how the updated application addressed the FDIC's questions, including:

a.      The transaction would be a cash-for-stock exchange and the contemplated equity injection would be removed as it was not a part of the control acquisition, and was instead a mere tentative plan that the Bank would explore further in the future, and Mrs. Hurry would, if the offering materialized, participate fully or partially.

b.      The source of the funds was a family trust.  The funds had been placed in an attorney trust account administered by her counsel, Nummi and Associates, under her control and for her benefit and investment use.

c.      Mrs. Hurry's role would be that of a passive investor.  She would not be involved in day-to-day management nor would she serve on the Board.  She would rely on reports from the Bank, and would attend annual meetings or provide proxy to management, if appropriate.

d.      Mrs. Hurry's revised financial statements reflected only one-half of the value of assets held jointly with Mr. Hurry, which were in addition to the segregated funds that had been set aside for purpose of the acquisition.  Mr. Klinkhardt advised that, in his experience, the FDIC has accepted this approach in the past.  *Id*. at 3.

e.      While the FDIC sought "ownership percentages" of "associated" businesses, Mr. Kilnkhardt again advised that Mrs. Hurry *does not own* any of the entities held by the family's irrevocable trusts.   The Hurry Family *Revocable* Trust owned only BRICFM LLC and WD Clearing LLC, but Mrs. Hurry has no direct ownership or control of those businesses. *Id*. at 4.

4

f.     Mrs. Hurry may discuss the investment with her husband but Mrs. Hurry alone would oversee the investment and make all decisions concerning the investment on her own and independent of Mr. Hurry. *Id.*

g.     Mrs. Hurry intended to contribute to the Bank's growth by referring deposit and loan opportunities.

Each component of the information required by the statute was, at that point, provided and amplified.  It is undisputed that the FDIC did not, thereafter, disapprove the notice or extend its time to review the notice.  Rule 56.1 at ¶ 6.  Because the Notice was not disapproved in accordance with the statute on or before February 17, 2018, the transaction could proceed.  Rule 56.1 at ¶ 7. Even if the FDIC had sought extensions, its time to disapprove the notice expired, at the latest, in July 2018. Rule 56.1  at ¶¶ 7-8.

### 2.  The FDIC's January 2018 Repetitive and Irrelevant Requests for Information

After December 21, 2017, the FDIC put forth a series of inquiries that were either repetitive, had already been addressed, were irrelevant or were discriminatory.  On January 12, 2018, the FDIC again requested information that had already been provided.  Rule 56.1 at ¶ 9 and Exhibit D: January 12, 2018 Letter from FDIC to Phil Klinkhardt.  Specifically, the FDIC sought information concerning (i) the proposed equity injection although Mr. Klinkhardt had already explained it was merely tentative and neither contingent upon nor otherwise related to Mrs. Hurry's acquisition of the common stock of the Bank; (ii) the source of funds although Mr. Klinkhardt had already identified, with supporting documentation and account statements, that the funds derived from a family trust and were held in an attorney trust account at SunTrust for Mrs. Hurry's benefit and were administered by her counsel, Nummi and Associates; (iii) Mrs. Hurry's role in administering the investment and/or at the Bank although Mr. Klinkhardt had explained that she would have no role, no directorship or officer position, and would simply monitor the investment through reports provided by the Bank; (iv) the role of *Mr.*

*Hurry* (characterized in two different ways),[1] although Mr. Klinkhardt had confirmed that all decisions and control resided with Mrs. Hurry independent of her husband; and (v) information concerning the "ownership percentages" in relation to entities that were held by irrevocable trusts which, according to the FDIC, was relevant to Mrs. Hurry's "financial capacity to complete the proposed transaction, although Mr. Klinkhardt's had already explained that Mrs. Hurry was merely a trust beneficiary, had no "ownership" or control over those entities or holdings, and that they had no relationship to the proposed transaction.[2]  *Id.* at 3-6.   The FDIC specifically stated, in that letter, that "the FDIC may disapprove a Notice" if the acquirer fails to provide the "information required by the FDIC" (citing 12 U.S.C. 1817(j)(7)(e)).  *Id.* at 2

Despite these redundancies, Mrs. Hurry, through Mr. Klinkhardt, submitted additional information.  Rule 56.1 at ¶ 10 and Exhibit E: March 23, 2018 Letter from FDIC to Klinkhardt.

### 3.   The FDIC's Continued Requests For Information Regarding Available Funds and Trust Entities

During the period March 23, 2018 through September 2018, the FDIC continued to request "additional" information, now focused on two particular issues.  Specifically, the FDIC requested further proof of available funds, raising an issue about the fact that the Suntrust bank statement reflected the escrow of the funds with the attorney did not attribute the funds to Mrs. Hurry.  Rule 56.1 at ¶ 11 and Exhibit F: March 23, 2018 Letter from FDIC to Klinkhardt at 2.  Secondly, the FDIC again

---

[1]  Having already been advised that Mrs. Hurry was making the investment and would direct and oversee the investment, the FDIC nonetheless asked "what, if any involvement Mr. Hurry would have with the bank, including any direct or indirect control over the institution," and pressed the requirement that Mr. Hurry sign the certification as to assets although the Notice was revised to include only half of any jointly held asset and Mr. Klinkhardt confirmed that the FDIC had previously agreed to such a procedure.  *Id.* at 5-6.

[2]  At another point, the FDIC again sought "trust documentation" as to entities that had already been identified as being held in irrevocable trusts of which Mrs. Hurry was a beneficiary although that information was already disclosed.  The FDIC claimed its request related to "Mrs. Hurry's financial capacity to complete the proposed transaction," *id.* at 5, although her financial capacity was amply demonstrated by the biographical and financial information that had been provided.

sought a "list of Mr. Hurry's associations and affiliations" to assess her "business background, activities and affiliations." *Id*.

On March 30, 2018, Mr. Klinkhardt, on behalf of Mrs. Hurry, submitted further documentation from an attorney for Mrs. Hurry, Richard Nummi, again confirming the availability of the funds. That information confirmed that the trust account was administered by Nummi & Associates in accordance with the Rules of the Florida Bar and Florida Supreme Court. Mr. Nummi represented and certified, under penalty of perjury, that the funds reflected on the account statement for that trust account were held on behalf of Mrs. Hurry, were under her exclusive direction and control, and were unencumbered and immediately available to her. Rule 56.1 at ¶ 12 and Exhibit G: Letter from Phil Klinkhardt to FDIC and Exh. A to  Exhibit G.

Mr. Klinkhardt's letter further sought to address the FDIC's requests concerning Mrs. Hurry's "associations" and affiliations by virtue of her connection with the irrevocable trusts. First, he had previously provided a comprehensive list of the associated businesses in the Notice and so the FDIC was fully apprised of her associations.[3] Rule 56.1 at ¶¶ 1-2 and Exhibit B at 4. He explained that Mrs. Hurry did not own entities that were held by the trust; "with an irrevocable trust, the law sees all properties as no longer belonging to the original owners." He again explained that she *did not exercise control* over the irrevocable trusts. *Id*.

He also explained the privacy associated with the establishment of a family trust and the fact that the terms of the trust precluded her dissemination of trust documentation, and submitted an opinion from trust counsel explaining the basis for the restriction on Mrs. Hurry's ability to disclose the trust documentation grounded in Uniform Trust Code § 1013. *Id. Nevertheless, Mr. Klinkhardt represented that Mrs. Hurry would agree to disclose a list of all of the trusts investments to the Bank's*

---

[3] The Notice provided the requisite information concerning her business affiliations and her employment background; the confidential family trust documents would not contain any of that information.   Rule 56.1 at ¶¶ 1-2 and Exhibit B.

*Board of Directors to avoid potential regulatory issues, and would further agree to relinquish her role as trustee.* Mr. Klinkhardt emphasized that the trusts were not parties to the acquisition, had no interest in the acquisition, and were in no way related to Mrs. Hurry's decision to personally acquire control of the Bank through her personal means. *Id.*

On June 1, 2018, the FDIC responded, ignoring the information provided by Mr. Klinkhardt concerning the available funds, the issues of confidentiality and Mrs. Hurry's agreement to step down from her role with the trusts. The FDIC demanded effectively the same information concerning the availability of the funds, claiming that Mr. Nummi's authority over his own attorney trust account was somehow "unclear" and insisting, contrary to the procedures associated with attorney trust accounts, that the SunTrust bank statement of Mr. Nummi's escrow account would have to identify the source of the funds transferred into that account. Rule 56.1 at ¶ 14 and Exhibit H: June 1, 2018 Letter from FDIC to Klinkhardt at 2.

The FDIC also demanded the exact same information concerning the entities held by the irrevocable trusts. In fact, apart from a few changes to the opening paragraph, and the deletion of two sentences, the June 1, 2018 letter deploys the exact same language in its information requests as used in the March 23, 2018 letter. *Id.* at 2-3. The FDIC offered no explanation for why more trust documentation, *in addition* to her prior description of affiliated entities, would be relevant to its determination.

Mrs. Hurry, through Mr. Klinkhardt, responded on June 22, 2018 in a letter explaining in even greater detail the nature of the attorney's escrow account and the availability of the funds held in that on behalf of Mrs. Hurry by Nummi and Associates. Rule 56.1 at ¶ 15 and Exhibit I: June 22, 2018 Letter from Phil Klinkhardt to FDIC. Specifically, it explained that the attorney trust account was administered in compliance with the applicable rules of the Florida Bar and the Florida Supreme Court, and was recently deemed compliant by those authorities. Further, the letter explained, with

documentary support, that SunTrust merely kept a record of *the attorney* administering the account (i.e., Nummi & Associates) and did not keep a record of the client for whom the attorney administered the account; rather, such recordkeeping was an obligation of the attorney pursuant to the rules of the state bar and state supreme court. Therefore, the SunTrust account statements previously provided did not identify Mrs. Hurry or the Hurry Family Revocable Trust, but merely identified an attorney trust account for Nummi & Associates. Mr. Nummi confirmed that he has "sole and exclusive control" of his firm trust account, that the funds identified in the statement were deposited by Mrs. Hurry, and that the funds were subject to her direction and control.

> Under the Rules promulgated by the Florida Bar and the Florida Supreme Court, and under penalties of perjury, I am officially certifying as a member of, and under control and oversight of same, that the funds reflected in the previously provided Nummi & Associated IOTA Trust Account Statement are maintained on behalf of our client Ms. Justine Hurry, they are unencumbered and are immediately available to her for any purpose she so directs.

*Id*. at ¶ 16 and Exhibit I at 2-3. As Mr. Klinkhardt explained, the bank statement along with Richard Nummi's statement constituted the available documentation and provided ample and uncontroverted information concerning the availability and control of the funds.

In a separate letter dated July 2, 2018, Mrs. Hurry, through separate counsel, provided even more information relating to the irrevocable trusts. This letter explained that Mrs. Hurry had already submitted a detailed listing of her "associations" in November 2017 including companies that she knew or believed were controlled by the irrevocable trusts. David Baris, partner at Buckley Sandler, reiterated that "she is a not a trustee of those trusts; [s]he is a beneficiary." Rule 56.1 at17 and Exhibit J: Letter from David Baris to FDIC. Under the FDIC's definition of "associated," Mr. Baris advised, she would not have had to reference those companies in her filing. *Id.* and Exhibit J at 3. Further, he reiterated that Mrs. Hurry was a trustee of the Hurry Family Revocable Trust, which trust agreement *had* been provided to the FDIC, and only those assets were reflected in her financial statements. All other trust interests, including irrevocable trusts, were merely *beneficial* interests, not ownership or

9

control interests.  Finally, it emphasized the legal restrictions on Mrs. Hurry's ability to disclose trust documentation for irrevocable trusts of which she is only a beneficiary, since such disclosure would reveal highly confidential information pertaining to the family and violate the privacy rights of other persons involved in those trusts.  *Id.* at 4.  Mr. Baris also expressed the concern that Ms. Hurry had been subjected to assertions and requests that would not have been made if a male had filed the Notice but again assured the FDIC would step down from her role as trustee.

The FDIC responded on July 24, 2018, stating that the communications from Mr. Klinkhardt and Mrs. Hurry's other counsel, David Baris, were insufficient because they "failed to include the additional information we requested." Rule 56.1 at ¶ 18 and Exhibit K: July 24, 2018 Letter from FDIC to Klinkhardt.   The detailed information provided by Ms. Hurry and her various attorneys was hardly acknowledged, and the documentation concerning the irrevocable trusts was again demanded, supposedly to complete a review of "Ms. Hurry's competence, experience, integrity and financial ability." *Id.*

Mrs. Hurry, through counsel at Buckley Sandler, submitted another letter on August 8, 2018, recounting the extensive back and forth with the FDIC over the irrevocable trust documentation issue. Mr. Baris underscored that the trust documents were neither relevant to nor required by statute. The FDIC was only permitted to seek "information relevant to a determination of the notificant's suitability to control a bank . . . [and] suitability include[s] competence, experience, integrity, and financial ability." Rule 56.1 at ¶ 19 and Exhibit L:  August 8, 2018 Letter from David Baris to FDIC.  Mr. Baris explained once more that Mrs. Hurry was solely a beneficiary, with no control, directly or indirectly, over the trusts or trustees. As a beneficiary, "it is not within Ms. Hurry's control to provide the documentation regarding the trusts." *Id.*   Mr. Baris concluding by emphasizing that Ms. Hurry "has met all of the informational requirements of 12 U.S.C. § 1817(j)(6)," had properly submitted the requisite forms, and had published notice of the filing.

Mrs. Hurry sent a follow-up letter on September 10, 2018, proposing specific ways to provide the FDIC with any information that could be relevant to the scope of its reviews while preserving the confidentiality of personal family trust material. Rule 56.1 at ¶ 20 and Exhibit M: September 10, 2018 Letter from Baris to FDIC.

On September 19, 2018, the FDIC responded indicating that it had unilaterally closed the file as incomplete pursuant to 12 C.F.R. § 303.11(e), which purports to permit the FDIC to deem an application abandoned if "requested" information is not provided within a time period specified by the agency.  Rule 56.1 at ¶ 21 and Exhibit N: September 19, 2018 Letter from FDIC to Baris.

**ARGUMENT**

**POINT I**

**BECAUSE THE FDIC FAILED TO DISAPPROVE THE TRANSACTION
IN ACCORDANCE WITH THE STATUTE,
THE TRANSACTION MAY PROCEED**

**A.   Applicable Law**

In its review of agency action, the district court's role is to "determine whether or not as a matter of law the evidence in the record permitted the agency to make the decision it did." *Overdevest Nurseries LP v. Scalia*, 2020 U.S. Dist LEXIS 66292 at *13 (D.D.C. April 15, 2020) (*citing Stuttering Found. of Am. v. Springer*, 498 F.Supp. 2d 203, 207 (D.D.C. 2007)).  Under the APA, the district court must "'hold unlawful and set aside agency action, findings and conclusions' that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;' 'contrary to constitutional right, power, privilege or immunity;' or 'in excess of statutory jurisdiction, authority or limitations or short of statutory right.'"  *Id. (citations omitted)*.  *See American Hospital Assoc. v. Azar,* 2020 U.S. Dist. LEXIS 110130 at *15 (D.D.C. June 23, 2020) (*citing Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006)).  The agency must "articulate a satisfactory explanation of its action including a 'rational connection between the facts found and the choice made.'"

An agency's reliance on and interpretation of its own regulations implicate recent Supreme Court decisions concerning the application of agency deference including *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), and *Department of Homeland Security et al. v. Regents of the University of California,* 140 S.Ct. 1891 (2020) (*"DACA Decision"). Where the agency is espousing an interpretation of a statute, the courts look to the *Chevron* framework; where the agency is advancing an interpretation of its own regulations, *Auer* deference is the appropriate analysis.

These principles of agency deference have been scrutinized, and often criticized, by the Supreme Court in recent years.  *See AHA,* 2020 U.S. Dist. LEXIS 110130 at *16 & n. 5. While *Kisor*

did not expressly overrule *Auer* deference, it "remodeled" and "revised" that concept to "cabin its scope in varied and critical ways" to ensure that courts would no longer "afford *Auer* deference mechanically. *Kisor*, 139 S. Ct. at 2414-15, 2425, 2447-48. The Supreme Court first articulated, in plainest terms, that *Auer* deference does not apply unless and until the court has applied all the traditional tools of statutory construction to assess the validity and meaning of the relevant provision. Based on that threshold issue, the Supreme Court reversed the lower court in *Kisor* because it failed to "empty the legal toolkit" of statutory construction in its interpretation of a regulation before applying agency deference. As the Supreme Court stated, the lower court "jumped the gun."

The court's analysis of statutory language must be equally if not more rigorous when an agency is propounding interpretations of legislation passed by Congress. Where *Chevron* deference is applicable, the court must determine "whether Congress has directly spoken to the precise question at issue." The court must faithfully consider and apply the language of the statute, giving effect "to every clause and word of a statute." *Overdevest,* 2020 U.S. Dist. LEXIS 66292 at *16-17 & n. 5. "If the intent of Congress is clear, that is the end of the matter." *AHA,* 2020 U.S. Dist. LEXIS 110130 at *17. Only where the statute is ambiguous, and "Congress has explicitly left a gap for the agency to fill," should the court consider whether the agency's position is based on "a construction of the law." *Id.* If the agency action is contrary to the statute or unreasonable, or exceeds the agency's authority, it will be rejected. *Id.*

The obligation of the courts to ensure implementation of legislation enacted by Congress, as opposed to an agency's imbuing itself with authority that runs counter to the statute, is illustrated by the decision in *3Q Digit., Inc. v. U.S. Citizenship & Immigration Servs.*, No. 1:19-cv-579-RCL, 2020 U.S. Dist. LEXIS 39558, at *16 (D.D.C. Mar. 6, 2020). There, the plaintiff submitted a petition seeking to employ a nonimmigrant worker under the H-1B visa program. *Id.* at *2-4. The agency received the petition, sought additional information relating to whether the position qualifies as a

"specialty occupation," and then denied the petition. *Id.* at *4. Confirming that "courts must ensure that agencies are making decisions that can be justified based on the administrative record," the court evaluated the agency's claim that it was permitted to decide that the employment position at issue did not require a college degree. *Id.* The court readily rejected the agency's position, finding that it exceeded the agency's authority and underscoring that the "Court will not tolerate any attempts within the agency to artificially create such limits in direct contravention of the governing statute and regulations." *Id.*

As a separate matter, the Supreme Court in *Kisor* and the DACA Decision set forth considerations that govern whether, even where a statute or regulation at issue is found to be "ambiguous," a particular agency assertion is entitled to deference. In *Kisor*, the Supreme Court emphasized that deference is not warranted, for example, unless the statement is an "authoritative" or "deliberative" pronouncement of the agency, a "fair and considered judgment" of the agency as opposed to a "convenient litigating position." *Kisor,* 139 S. Ct. at 2415-17, 2423-24. The Supreme Court provided further guidance this year in the DACA Decision. The Court there focused on the issue of whether the agency action at issue was "adequately explained," and stated that consideration of that issue "requires, first, knowing where to look for the agency's explanation." 140 S.Ct. at 1907. In that case, DHS had put forth an initial articulation of its action but then, during the litigation, offered other explanations. In that context, the Court established an "important limitation" on the analysis: only the agency's initial position may be considered. *Id.* at 1908. In evaluating whether the agency complied with the APA, the agency's *"original reasons"* "must be viewed critically to ensure that the [agency action] is not upheld on the basis of 'impermissible post hoc rationalization." *Id.* Thus, "an agency must defend its actions based on the reasons that it gave when it acted." *Id.* at 1909-10.

14

**B. The FDIC Failed to Disapprove the Notice in Accordance With the Relevant Statute**

The initial issue before this court, therefore, remains the plain language of the relevant statute and whether the agency action is consistent with those provisions.  As discussed above, the statute sets forth, without ambiguity, the requisites and procedures for submission and consideration of a Notice of Change of Control and the appellate review that follows a disapproval of a Notice. *See* 12 U.S.C. §1817(j).  The statute provides proper parameters to circumscribe agency action, describing both the process and the specific circumstances that would warrant disapproval. *Id*. at §1817(j)(7).  The CBCA places the onus on the FDIC to disapprove the Notice: it must "issue[] a notice disapproving the proposed acquisition" or the acquisition may proceed.  *Id*. at §1817(j)(1).  It makes clear that the FDIC may disapprove the transaction only for specified reasons, which include an applicant's failure to provide "required information," and it must state "the basis for the disapproval." *Id.* at §1817(j)(7)(E). A disapproval then triggers the period for administrative and judicial appeals. As the statute makes clear, approval and disapproval are the only authorized actions and the applicant' rights to internal agency review and further judicial review are triggered only when there has been "disapproval." *Id.* The statute does not authorize the FDIC to "close" an application or deem it "abandoned."  Indeed, neither the word "close" nor the word "abandon" appear *anywhere* in Section 1817.

This construction of the statute is confirmed by the FDIC's own regulations pertaining to appeals of change in control decisions. 12 C.F.R. § 303.11(f) directs that "[a]ppeal procedures for a denial of a change in bank control" are governed by Subpart D of 12 C.F.R. part 308.  Part 308, Subpart D, in turn, limits its scope to "proceedings in connection with the ***disapproval*** by the Board of Directors or its designee of a proposed acquisition of control." 12 C.F.R. §308.110 (emphasis added). The remainder of the regulations in Subpart D refer only to "disapproval." *See id.* at §308.111 ("Grounds for disapproval"); *id.* at 308.112 ("Notice of disapproval"); *id.* at §308.113 ("Answer to notice of disapproval"). If the FDIC could unilaterally decide that a party had not provided adequate

15

information, regardless of how robust the application or how inappropriate the information requested, the party whose application is deemed abandoned has no administrative recourse.

Here, Congress addressed the precise issue presented in this case, *i.e.,* the process whereby a Notice is submitted and adjudicated.  It is undisputed here that the FDIC failed to adhere to the statutory process established by Congress and once the sixty-day period expired, without valid action by the FDIC, the transaction could proceed.  Any subsequent action is unauthorized and invalid.

### C.  The FDIC Failed to Take Any Action Within the Time Prescribed by Statute and so its Subsequent Action is Invalid

The CBCA also plainly sets forth the action that the agency must take if, for some reason, it is unable to assess the Notice within the initial sixty-day disapproval period.  It permits the FDIC to extend "the period for disapproval" up to a total of 120 days.  12 U.S.C. §1817(j)(1). It provides no authorization for the FDIC to simply ignore those prescribed time tables.

Here, the FDIC invoked the provision of the statute that would address a failure to provide required information, but failed to disapprove the transaction within the sixty-day period, extend the period, or act within the aggregate period that would have been available had it bothered to seek extensions.   Even the purported "closing" of Mrs. Hurry's application did not occur within the specified time frame; only after the disapproval period *had expired* did the FDIC decide to invoke §303.11(e) as the basis for "closure" of the file.  It has never put forth any rational reason for its utter disregard of the procedures that Congress established, but the effect of its action is clear: Mrs. Hurry is deprived of the Congressionally-mandated appellate procedures embedded in the CBCA.

Because it took no valid action during the "disapproval period," and did not even claim to "close" the file until after that period had lapsed, Plaintiff's right to relief is clear and the Court should issue a declaratory judgment stating that the transaction may proceed.

16

**D.  The FDIC's Excuses Are Unsupported by the Administrative Record and Baseless**

**1.  The Notice Was Submitted in Accordance with the Provisions of the CBCA and the Applicant was Entitled to Consideration of the Notice**

The FDIC claims, first, that because it sought additional confidential family trust documentation from Ms. Hurry, the Notice was never "substantially complete" and so the disapproval period never commenced.   Because the governing statute contains no such qualification, the FDIC relies on its own regulations, 12 C.F.R. §303.86(b).  But the regulation does not permit the FDIC to refuse to consider a Notice merely because the FDIC seeks additional information.  Rather, the FDIC is *required* to address a Notice that advises the FDIC of the proposed transaction and contains the information called for by the FDIC's forms.  As stated in §303.82, "Notice" means "a submission notifying the FDIC that a depository institution intends to engage in or has commenced certain corporate activities or transactions."   The CBCA likewise makes clear that the FDIC cannot unilaterally absolve itself of responsibility to consider such an application; §1817 states, for example, that the disapproval period runs from the time that the agency "receive[s] *any notice* under this subsection." 12 U.S.C. §1817(j)(2)(B) (emphasis added).

To accept the FDIC's view that it could unilaterally deem this particular Notice "incomplete," because additional information was requested would render meaningless the procedures carefully delineated by the statute.  First, Section 1817(j)(1) states precisely what the FDIC may do when "the acquiring party has not furnished all the information required" or the information is "substantially inaccurate":  it may extend the period for disapproval twice, each time for 45 days.  12 U.S.C. §1817(j)(1)(A)-(B).  Likewise, it may seek an extension when the acquiring party does not cooperate, or the FDIC simply determines that it requires more time to investigate or analyze the proposed acquisition.  *Id.* §1817(j)(1)(C)-(D). That ordinary process of seeking further information does not, or

at least should not, enable the FDIC to ignore the specific timetables contained in the statute. To the contrary, it lays out for the agency the appropriate process.

Second, upon receipt of the Notice, the statue then clearly directs the FDIC to investigate for, among other things, completeness of the information provided. *See* 12 U.S.C. § 1817(j)(2), (6). If the FDIC determines the information is incomplete, the statue provides the answer:  the FDIC "may disapprove" the acquisition because "any acquiring person neglects, fails, or refuses to furnish the [FDIC] all the information required."  *Id.* § 1817(j)(7)(E).  An absence of even required information does not start the clock on the period for disapproval.  Rather, as part of its investigation within the period for disapproval, the FDIC must make "an independent determination of the accuracy and *completeness*" of the information provided. *Id.* § 1817(j)(2)(B) (emphasis added).  The statute is clear in this respect: (i) the period for disapproval runs from the FDIC's "receiving any notice" (*id.*); (ii) if the FDIC finds the notice incomplete, it may extend the period for disapproval (*id.* § 1817(j)(1)); and (iii) if the notice remains incomplete after the permitted extension are exhausted, the notice may be disapproved. *Id.* § 1817(j)(7)(E).  The statute is clear, its procedures do not impose any undue burden on the FDIC, and the only substantial issue presented by these facts is why the FDIC so adamantly refuses to comply with them.

Where, as here, the Notice contains detailed responses to the inquiries contained in the Notice form, the agency may not unilaterally declare it "substantially incomplete" and thereby deprive the applicant of consideration of the submission.  To the extent that the FDIC insists that it has empowered itself to refuse to consider a Notice that contains the required transactional and biographical information, its action is contrary to the law and invalid.

**2. The FDIC Cannot Circumvent Statutory Procedures by Authorizing Itself to Deem a File "Abandoned"**

.  Notwithstanding the specific Congressional directives contained in the CBCA, the FDIC asserts that it has empowered itself, through § 303.11(e), to take other and different action, under the same precise circumstances, and thereby deprive the applicant of any right of review.  According to the FDIC, it is permitted to disregard the statutory process by requesting additional information, even where its requests are redundant or nonsensical, and then use its requests as the basis to deem the file "abandoned," notwithstanding continuous interaction with and responses from the applicant.  It insists it can thereby "close" the file pursuant to §303.11(e) without having to deal with administrative review.  The FDIC is wrong; it is not permitted to subvert the specific terms of the CBCA and grant itself new and different powers. *See, e.g., S*elect Specialty Hosps., Inc. v. Azar, No. 19-2591 (BAH), 2020 U.S. Dist. LEXIS 92410, at *14-15 (D.D.C. May 26, 2020) (regulation may be rejected where it is "contrary to the statute").

The court in *Friedman v. FAA*, 841 F.3d 537 (D.C. Cir. 2016)*,* rejected an analogous attempt by the FAA to "place [Plaintiff] in a holding pattern – preventing [her] from obtaining any explicitly final determination on [her] application and thwarting the Court's interest in reviewing those agency actions that, in practical effect if not formal acknowledgement, constitute the consummation of the agency's decision-making process and determine rights of obligations." *Id.* at 542. As the Court  held, "[t]he Agency cannot manipulate its own processes, threatening denial but then refusing to deny or otherwise take definitive action on [plaintiff]'s application, in an effort to thwart judicial review" and keep the plaintiff "in administrative limbo." *Id.* at 545.

The regulation on which the FDIC relies, and the agency action at issue, are invalid also because the agency failed even to adhere to the standards enunciated in the statute.  While the statute permits the agency to disapprove a Notice where certain information is not provided, it does so in clear

19

language:  the FDIC may disapprove the Notice if the applicant has failed to provide *"required"* information.  12 U.S.C. §1817(j)(7)(E).  The reference to "required" information, in turn, makes clear that a disapproval would have to be predicated on an applicant's failure to provide the information that is relevant to the areas of inquiry identified in the statute and therefore *required* under the statute.   But here, the agency did not even claim that the applicant had failed to provide "required" information.  Instead, it asserts that it could fail to consider the application based on a failure to provide *"requested"* information.  And that distinction is far from semantics.  That change in language effects a significant expansion of the agency's authority since, as this case illustrates, the agency can "request" information that falls well outside the scope of that which is relevant or required.  It can decide that it can inquire into aspects of a family's confidential estate planning activities or even the dynamic between husband and wife, request materials relating to those topics, and then "close" the file when the applicant balks at intrusive and irrelevant demands.  Because the regulation itself, and the agency's action, are *not* consistent with the statutory language, the agency's assertion that it properly "closed" the file based on a failure to provide "requested" information is entitled to no *Auer* deference.  Its actions are plainly invalid.

Interestingly, that discrepancy in the applicable language may explain the question that looms large in this case: why did the agency, after initially invoking its ability to disapprove the Notice, change course and decide to "close" the file?  The FDIC may have changed its position simply because the period for disapproval had passed.  But its regulation also sets a lower standard.  Had it adhered to the provisions of the statute, and sought to disapprove the Notice under §1817(j)(7)(E), it would have had to establish that additional information concerning Mrs. Hurry's funds, and the provision of family trust documentation, were relevant to and *"required"* to adjudge the Notice.   The FDIC would then have had to defend that position through an appellate process.  But the FDIC received more than sufficient information on both of these issues; the provision of even more information was not

"required" and the demanded trust documents contained no additional information that was necessary for the agency to evaluate the Notice.  Those additional "requests" for information could, and we maintain were, used by the FDIC as an excuse to refuse properly to assess the Notice, but they would fail as a purported justification for disapproval under the statute.

That leaves only two possibilities: either the provision promulgated by the agency contravenes the statute, and is invalid, or the agency's promulgation has a different and narrower meaning.  Section 303.11(e) does seem to contemplate a situation distinct from the one presented here, and from the language of §1817.  Unlike the statute, the agency's rule speaks in terms of "abandonment" of a filing. In other words, it would address the circumstance where an applicant has literally failed to respond to the FDIC's request for information that is relevant to its inquiry and *required* by the statute. That might be a permissible interpretation of the provision, and one that would not conflict with the language of the statute. But that would certainly not apply here, where the Plaintiff continuously responded, provided information, and addressed each component of the agency's request for information. To rely on a claim of "abandonment" under these circumstances is a convenient but impermissible fiction that flouts the language of the statute.  That conclusion, that the "abandonment" provision is inapplicable to this case, is the only result that would avoid a finding by this Court that the agency's regulation is contrary to the statute and therefore invalid.

3. **The FDIC Itself Confirmed That 12 U.S.C. §1817(j)(7)(E) Applies to the Circumstance Where Requested Information is Not Provided**

Even if the statute were ambiguous concerning the submission and consideration of a Notice, such that the court should consider the agency's interpretation of the relevant provisions, the Supreme Court in the DACA Decision expressly held that the court should look to the agency's contemporaneous explanation and not *post hoc* rationalizations.  140 S. Ct. at 1909. The agency is not be permitted "to invoke belated justifications" for its conduct.  DACA Decision at 16 (citations

omitted).

Here, the agency itself stated, during its communications with Plaintiff, that the statute provided for *disapproval* of a Notice if "required" information is not provided.  Exhibit D at 2 ("The FDIC may disapprove a Notice if, among other things, the acquirer neglects, fails or refuses to furnish to the FDIC all information required by the FDIC. (12 USC 1817(j)(7)(e))."   Only after the Plaintiff made clear that it would challenge the agency's conduct did the agency, for the first time, invoke the concept of "abandonment" under its own rules.  Rule 56.1 at ¶¶ 9, 21.  That statement initially made by the agency was correct and should be considered by this Court; the FDIC's subsequent arguments to the contrary should not be.

## POINT II

### THE FAILURE TO CONSIDER THE NOTICE AND THE "CLOSURE" OF THE FILE WERE ARBITRARY AND CAPRICIOUS

An agency's violation of the arbitrary and capricious standard "can take various forms."  *AFL-CIO v. NLRB*, 2020 U.S.Dist. LEXIS 115857 at *18 (D.D.C. July 1, 2020).

> If the agency fails to 'provide any explanation whatsoever' for a challenged action, then it has violated the APA's arbitrariness prohibition by not providing a factual basis upon which a court may conclude that the agency has actually engaged in reasoned decisionmaking. … An agency similarly transgresses the APA's arbitrariness restriction if it 'entirely fails to consider an important aspect of the problem' or if its decision 'runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'

Under any of those circumstances, "it is the court's obligation to declare that the challenged rule is procedurally unlawful, and to vacate the agency's action under section 706 (2)(A) of the APA." *Id*.

If this Court were to conclude that the FDIC properly empowered itself to refuse to evaluate, and/or to "close" a file based on its own requests for further information, the administrative record in this case provides no basis for the court to conclude that its actions in this matter were reasoned or rational.  While the FDIC's initial inquiries as of January 2018 could be viewed as reasonable, its

actions by March of 2018 lacked any cogent explanation or rational basis. As of March 2018, the FDIC simply repeated, over and over, two requests: it sought additional information concerning the availability of the funds, and confidential trust documents. Its communications failed to provide any "factual basis" for its actions and no reasonable basis exists.

Looking first to the issue of the funds to be employed for the acquisition, the Notice confirmed the availability of cash and the availability of those funds. In accordance with the Notice instructions, Mrs. Hurry provided a bank statement reflecting that those funds were being held in her attorney's escrow account. When the FDIC still insisted that it needed additional verification of her control over those funds, Mrs. Hurry's counsel provided a certification from the attorney, verifying that she had deposited those funds and that they were being held for her benefit and under her control. The FDIC persisted in demanding more information, even failing to differentiate between assets derived from the family *trusts*, as opposed to funds held in the attorney's *trust* account.[4] The administrative record is devoid of any basis for the FDIC to demand even more information. Rule 56.1 at ¶¶ 1-4, 9-12.

The agency has also failed to offer any explanation for its demand for information concerning Plaintiff's husband (as if she lacked her own independent character and resources) or its demand for confidential family trust documents. The statute and the biographical form call for a listing of companies which with the applicant is "associated," and that information was provided including whether she occupied any position in relation to the entity. Rule 56.1 at ¶¶ 1-3 and Exhibit B at 4. Mrs. Hurry's counsel also repeatedly explained the nature of that association: Mrs. Hurry held one entity in a revocable trust but the remainder were held within irrevocable family trusts. *Id.* at 4. Both Mr. Klinkhardt and David Baris of Buckley Sandler explained that she maintained beneficial interests

---

[4] The FDIC had been informed that the funds for the acquisition were held in the attorney's trust account, and the attorney confirmed that the funds were held for the benefit of and under the control of Mrs. Hurry. Nonetheless, the FDIC responded that there was no information regarding Mrs. Hurry's access to the "trust" funds and then asks for "trust documents." Rule 56.1 at ¶ 9-10 and Exhibit D at 3-4. Since the funds were not held by the family trust, and were instead in the attorney's trust account for Mrs. Hurry's benefit, her control over the funds was clear.

in relation to those entities; that she would fully disclose to the Board of the bank all such affiliations; and that she would resign any role as trustee once the bank acquisition was approved.  Rule 56.1 at 13-19.  In response, the FDIC continued to reiterate the demand for trust documents.

The FDIC articulated no factual basis to support its demand and there is none.  The FDIC kept asking for "ownership percentages" even though the attorneys explained that she held *no* ownership, that the assets were owned by the trust.  The FDIC claimed that it sought trust documents in relation to her financial capability, but that information had already been provided and trust documents in no way quantify her assets.  The FDIC asserted in conclusory terms that the information related to her experience and background, when her relevant employment experience had been provided, her role in relation to the entities had been disclosed, and the trust documents contain no further information regarding her particular employment experience.  The FDIC continued to insist that she had to provide trust documents in relation to beneficial interests when, as the attorneys explained, those documents are subject to privacy protections and beneficiaries do not have the right to disseminate such documents and often do not have access to or even knowledge of them.  The FDIC's demands made no sense and fall squarely within the definition of action that is arbitrary: it "entirely fail[ed] to consider an important aspect of the problem,'… its decision 'runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  The FDIC did not even attempt to justify or explain its insistence on receipt of those confidential family trust documents nor did it acknowledge the various proposals made by Mrs. Hurry to provide equivalent information to address any specific regulatory issues or concerns.   This administrative record supports only the view that the FDIC persisted in making arbitrary demands that bore no relation to the proper consideration of the Notice.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that the Motion for Summary Judgment should be granted in its entirety.

Dated:  September 8, 2020

Respectfully submitted,

THOMPSON HINE LLP

By:___/s/ Joseph A. Smith_____
Joseph A. Smith
D.C. Bar No. 1010223
1919 M Street, N.W., Suite 700
Washington, D.C. 20036
Phone: (202) 331-8800
Fax: (202) 331-8330
joe.smith@thompsonhine.com

Brian Lanciault (admitted *pro hac vice*)
Thompson Hine LLP
1919 M Street, N.W., Suite 700
Washington, D.C. 20036
Phone: (202) 331-8800
Fax: (202) 331-8330
Brian.Lanciault@ThompsonHine.com

Maranda E. Fritz P.C.

___/s/Maranda E. Fritz_____
Maranda E. Fritz (admitted *pro hac vice*)
335 Madison Avenue
New York, New York 10017
Phone: (646) 584-8231
maranda@fritzpc.com

*Counsel for Plaintiff Justine Hurry*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September 2020, I caused the foregoing to be filed and served via ECF, on the following:

Erick Bond
Counsel, Corporate Litigation Unit
3501 N. Fairfax Drive, D-7026
Arlington, VA 22226
*Counsel for FDIC Defendants*

_____/s/ Joseph A. Smith_____
Joseph A. Smith