# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JUSTINE HURRY,

          *Plaintiff*,

    v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, *et al.*,

          *Defendants.*

Civil Action No. 18-2435 (RDM)

## <u>MEMORANDUM OPINION</u>

The Change in Bank Control Act of 1978 ("CBCA") prohibits a person from acquiring a controlling interest in a bank unless the "appropriate Federal banking agency has been given sixty days' prior written notice of [the] proposed acquisition and within that time period the agency has not issued a notice disapproving the proposed acquisition." 12 U.S.C. § 1817(j)(1). The agency may extend that period for up to 120 days if certain conditions are met, and it may disapprove the proposed acquisition if, among other things, the "acquiring person neglects, fails, or refuses to furnish the [agency] all the information [the agency] require[s]." *Id.* § 1817(j)(7)(E). If the agency disapproves the proposed transaction, "the acquiring party may request an agency hearing on the proposed transaction," and, at the completion of the hearing, the agency must issue an order either approving or disapproving the proposed acquisition. *Id.* § 1817(j)(4). If the acquisition is again disapproved after the hearing, the acquiring party may then seek review in the D.C. Circuit or in "the circuit in which the home office of the bank to be acquired is located." *Id.* § 1817(j)(5). This case poses the question whether a federal banking agency may circumvent this process by declining to accept a notice of proposed acquisition in

the first place on the ground that it is not "substantially complete."  If so, the 60-day clock (or, if extended, the 180-day clock) never starts, and neither an administrative hearing nor direct review in a court of appeals is available.  The answer to that question turns on the particular circumstances presented.

Here, Plaintiff Justine Hurry provided the relevant federal banking agency—Defendant Federal Deposit Insurance Corporation ("FDIC")—with written notice of her proposed acquisition of the Bank of Orrick.  A few weeks later, the FDIC concluded that the notice was incomplete and, accordingly, returned it to Hurry.  In response, Hurry resubmitted her notice, along with additional information and documentation.  But the FDIC was still unsatisfied, and it once again returned the notice as incomplete.  After the FDIC and Hurry's counsel conferred about the missing information, Hurry submitted her written notice for a third time.  That third effort helped but not enough, and the FDIC warned Hurry that, if she did not promptly provide it with additional information relating to (1) the source of funds necessary to complete the transaction and (2) Hurry's associations and affiliations (along with relevant trust documentation), the agency would conclude that she did "not want to furnish the requested information."  Dkt. 29-1 at 295.  In response, Hurry submitted some additional material, but she also took issue with the FDIC's request for information regarding two irrevocable trusts, arguing that the information was both unnecessary and invasive of third-party privacy interests.  The FDIC, for its part, concluded that Hurry's submission was "improved" but that it was still inadequate.

After yet another submission of additional material, the FDIC appeared satisfied that Hurry had addressed the source of funds, but it disagreed with her counsel regarding the need for information relating to the irrevocable trusts.  Once again, the agency "return[ed] the filing as

incomplete because [Hurry] ha[d] not submitted . . . the needed information." *Id.* at 293. Concluding that the dispute had run its course, Hurry requested that the agency "make a final decision on the notice of change of control . . . based on the information previously provided." *Id.* at 373. After internal deliberations, the FDIC sent Hurry its final determination, which forms the basis of Hurry's challenge in this case. That letter explained that the FDIC had previously returned Hurry's notice as incomplete and that, despite the extensive back-and-forth, Hurry had failed to provide the agency "with all the information needed to complete a review of her competence, experience, integrity, and financial ability pursuant to 12 U.S.C. § 1817(j)." *Id.* at 393. But rather than accept Hurry's invitation to render a final decision on the merits of her notice, the FDIC decided to close Hurry's file on grounds of abandonment, thereby ending the administrative process—if, in fact, it ever began.

Hurry then brought this challenge, and, after an initial false start, she amended her complaint to assert three claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. Count I seeks to compel the FDIC to take administrative action (either approving or disapproving her notice) unlawfully withheld. Count II challenges the FDIC's decision to close her file on grounds of abandonment as arbitrary and capricious and contrary to law. Count III alleges that the FDIC arbitrarily sought information regarding the finances of Hurry's husband, demonstrating an "impermissible bias" based on Hurry's sex and the assumption that her husband would exert control over the bank.

As explained below, the Court concludes that Count I is based on the premise that the FDIC was required to act on Hurry's written notice of proposed acquisition. That premise is incorrect because the CBCA does not require the federal banking agency to act; instead, it *permits* the agency to *disapprove* a proposed acquisition within the prescribed time period but, if

the agency does not act, the acquisition may proceed.  The problem here is not that the FDIC

failed to act on the notice; the problem is that it refused to accept the notice in the first place.

That separate problem is addressed in Count II of the Amended Complaint, which alleges that

the FDIC erred in refusing to accept the notice and then closing Hurry's file as abandoned.  The

Court agrees with Hurry that the FDIC erred in this limited respect and concludes that the agency

should have accepted the notice, and, then, if dissatisfied with the information that Hurry

provided, it could have disapproved the acquisition.  Had the FDIC done so, Hurry would have

had the right to a hearing and, if unsuccessful, to seek review of the agency's decision on the

merits in an appropriate court of appeals.  By declining even to accept the notice, however, the

FDIC cut short Hurry's procedural rights and deprived her of her statutory right to an

administrative hearing and to direct appellate review.  Finally, Hurry says almost nothing about

Count III in her motion or opposition, and the Court has no reason, based on the existing record

and briefing, to conclude that the FDIC unlawfully focused on Hurry's husband.

The Court will, accordingly, **GRANT** Hurry's motion for summary judgment in part,

Dkt. 23, as to Count II; will **DENY** her motion as to Count I; will **DENY** the FDIC's cross-

motion for summary judgment, Dkt. 24, as to Count II; will **GRANT** the FDIC's motion as to

Count I; and will **DISMISS** Count III as premature.

## I.  BACKGROUND

### A.  Statutory and Regulatory Background

Under the Change in Bank Control Act of 1978, Pub. L. No. 95-630, 92 Stat. 3641,

3683–87 (codified as amended at 12 U.S.C. § 1817(j)), a person may not "acquire control of any

insured depository institution" unless "the appropriate Federal banking agency has been given

sixty days' prior written notice of [the] proposed acquisition," and, "within that time period the

agency has not issued a notice disapproving the proposed acquisition," 12 U.S.C. § 1817(j)(1).

The 60-day period, however, is not cast in stone.  To start, the agency may, in its discretion,

extend the disapproval period for "an additional 30 days."  *Id.*  Beyond that, the "period for

disapproval . . . may be extended" up to two additional times "for not more than 45 days each,"

but only if:

> (A)   the agency determines that any acquiring party has not furnished all the information required under paragraph (6);
>
> (B)   in the agency's judgment, any material information submitted is substantially inaccurate;
>
> (C)   the agency has been unable to complete the investigation of an acquiring party under paragraph (2)(B) because of any delay caused by, or the inadequate cooperation of, such acquiring party; or
>
> (D)   the agency determines that additional time is needed—
>
>> (i)   to investigate and determine that no acquiring party has a record of failing to comply with the requirements of subchapter II of chapter 53 of Title 31; or
>>
>> (ii)   to analyze the safety and soundness of any plans or proposals described in paragraph (6)(E) or the future prospects of the institution.

*Id.* § 1817(j)(1)(A)–(D).  Thus, if the banking agency exercises its authority to extend the period

of review to the maximum extent permitted by the CBCA, the agency has up to 180 days to

disapprove an acquisition.  "An acquisition may be made prior to expiration of the disapproval

period," however, "if the agency issues written notice of its intent not to disapprove the action."

*Id.* § 1817(j)(1).  Alternatively, if the relevant time period runs without FDIC action on the

written notice of proposed acquisition, the acquiring party is free to proceed.

Section 1817(j)(6)—or "Paragraph 6"—of the CBCA provides that, "[e]xcept as otherwise provided by regulation of the appropriate Federal banking agency, a notice filed pursuant to [the CBCA] shall contain," *inter alia*, the following information:

> (A)    The identity, personal history, business background and experience of each person by whom or on whose behalf the acquisition is to be made, including his material business activities and affiliations during the past five years**,** and a description of any material pending legal or administrative proceedings in which he is a party and any criminal indictment or conviction of such person by a State or Federal court.
>
> . . .
>
> (D)    The identity, source and amount of the funds or other consideration used or to be used in making the acquisition, and if any part of these funds or other consideration has been or is to be borrowed or otherwise obtained for the purpose of making the acquisition, a description of the transaction, the names of the parties, and any arrangements, agreements, or understandings with such persons.
>
> . . .
>
> (H)    Any additional relevant information in such form as the appropriate Federal banking agency may require by regulation or by specific request in connection with any particular notice.

*Id.* § 1817(j)(6).

The CBCA outlines the process by which the banking agency must investigate a proposed acquisition and may disapprove it. Upon receiving a "notice" of proposed acquisition, the banking agency shall investigate "the competence, experience, integrity, and financial ability" of the individuals named in the notice. *Id.* § 1817(j)(2)(B)(i). As part of that investigation, the agency must "make an independent determination of the accuracy and completeness of any information described in [Paragraph 6] with respect to such person." *Id.* § 1817(j)(2)(B)(ii). The banking agency may "disapprove any proposed action" for any of six reasons, *id.* § 1817(j)(7), including if "any acquiring person neglects, fails, or refuses to

furnish the appropriate Federal banking agency all the information required by the . . . agency," *id.* § 1817(j)(7)(E).

If the agency disapproves a change in bank control, the individual proposing the acquisition may seek review of the decision before the agency and, subsequently, in federal court. "Within three days" of deciding to disapprove a proposed acquisition, the agency must "notify the acquiring party in writing of the disapproval" and must "provide a statement of the basis for the disapproval." *Id.* § 1817(j)(3). Then, "[w]ithin ten days of receipt of such notice of disapproval," the acquiring party "may request an agency hearing on the proposed acquisition" pursuant to the APA's rules for formal adjudications. 12 U.S.C. § 1817(j)(4) (cross-referencing 5 U.S.C. § 554). "At the conclusion [of the hearing], the Federal banking agency shall by order approve or disapprove the proposed acquisition on the basis of the record made at such hearing." *Id.* If the agency disapproves the proposed acquisition after a hearing, the party seeking to acquire the bank "may obtain review by the United States court of appeals for the circuit in which the home bank office of the bank to be acquired is located" or in the D.C. Circuit, which must set aside the agency's decision "if [it is] found to be arbitrary or capricious or if [it is] found to violate the procedures established by the [CBCA]." *Id.* § 1817(j)(5).

For present purposes, the relevant federal banking agency is the FDIC, and the FDIC has promulgated regulations implementing the CBCA. Under those regulations, "[t]he 60-day notice period . . . shall commence on the day after the date of acceptance of a *substantially complete* notice by the appropriate regional director." 12 C.F.R. § 303.86(b)(1) (emphasis added). The FDIC must notify the person submitting a notice "of the date the notice is accepted as substantially complete," and the agency "may request additional information at any time." *Id.* § 303.86(a). The acquiring party "may consummate the proposed acquisition after the

expiration of the 60-day notice period, unless the FDIC disapproves the proposed acquisition or extends the notice period as provided in the CBCA." *Id.* § 303.86(b)(1). The regulations further provide that the written notice of a proposed acquisition must "contain all the information required by paragraph 6 of the CBCA" and that "[t]he FDIC may require additional information if appropriate." *Id.* § 303.85(a)(4). Finally, a regulation that applies generally to all FDIC filings provides that "[a] filing must contain all information set forth in the applicable subpart of" the FDIC regulations; that "[t]o the extent necessary to evaluate a filing, the FDIC may require an applicant to provide additional information"; and that "[i]f information requested by the FDIC is not provided within the time period specified by the agency, the FDIC may deem the filing abandoned" and may close the file. *Id.* § 303.11(e).

### B.   Administrative Background

On October 10, 2017, Hurry met with FDIC officials to discuss "taking steps to purchase . . . approximately 63% of outstanding stock" in the Bank of Orrick, an FDIC-insured bank in Missouri. Dkt. 29 at 1. The "purpose of the . . . meeting" was to discuss the change in bank control "application process, regulatory expectations, and to answer any questions [Hurry] may have." *Id.* Through her consultant, Phil Klinkhardt, Hurry had "submitted a draft notice of change in control application via email on September 27, 2017." *Id.* An FDIC representative "noted [at the meeting] that it's not normal procedure to review draft applications; however, the proactive approach [was] appreciated." *Id.*

On November 29, 2017, Hurry submitted her "formal" notice to the FDIC. *Id.* at 99. Her submission contained two main components: first, it contained an FDIC form entitled "Interagency Biographical and Financial Report." *Id.* at 100–19. Among other things, that form included a section, "Business and Banking Affiliations," that directed applicants to list "any

company with which [they] are associated" and any "position held or relationship to the
company" and "ownership percentage." *Id.* at 102.  Hurry provided a list of 46 companies and
indicated that she held the title of "Manager" for most of them, but she did not provide any
ownership percentages.  *Id.*  Below the list, the notice stated: "Justine [Hurry] is indirect
beneficiary interests held in irrevocable trusts[,] with the exception of [one company,] BRICFM
LLC[,] which is owned by her revocable trust."  *Id.*  BRICFM is one of the 46 companies that
Hurry listed.

The second component was an FDIC form entitled "Interagency Notice of Change in
Control," *see id.* at 121–26, which Hurry submitted along with 248 pages of exhibits, *see id.* at
127–375.  The interagency notice of change in control form requests that the proposed acquirer
provide, among other things, the "[t]otal purchase price" for control of the bank and the
"[s]ource and amount of funds."  *Id.* at 122.  Hurry disclosed a "[t]otal purchase price" of
$3,168,755 of which $1,000,000 would come in the form of "new equity" for the bank.  *Id.*  With
respect to the source of funds, the notice stated: "Cash, see financial statement in Mrs. Hurry's
Interagency Biographical & Financial Report and Exhibit B, Proof of Funds."  *Id.*  The
referenced financial statement reported, without supporting documentation, that Hurry's "cash on
hand and in depository institutions" equaled $5,276,986.  *Id.* at 107.  Exhibit B, in turn,
contained a copy of an account statement from SunTrust Bank that listed "Nummi and
Associates Agent for Trust Account IOTA" as the account holder and that indicated that the
account balance was "$2,552,835."  *Id.* at 202.

On December 8, 2017, the FDIC "return[ed]" Hurry's notice.  *Id.* at 376.  In a letter to
Klinkhardt, the agency wrote: "Due to the extent of missing information, [the FDIC]
consider[ed] the notice incomplete and [was] unable to process it as submitted."  *Id.*  The FDIC's

letter also stated that, "[i]f the proponents resubmit the notice, we need the following information to evaluate the proposal adequately," and it identified deficiencies in Hurry's Interagency Notice of Change of Control, Interagency Biographical and Financial Report, and accompanying exhibits. *Id.* at 376–79. Of relevance here, the letter noted that Hurry (1) failed to provide "adequate proof of available funds" to purchase control in the bank because the SunTrust account statement "provide[d] no identifiable information to conclude the funds [were], in fact, Ms. Hurry's," *id.* at 376; and (2) failed to include "affiliate ownership percentages" for the 46 companies she listed as business affiliations and "the corresponding trust documentation" for the irrevocable trusts in which Hurry had a beneficiary interest, "including controlling and beneficial interests as well as administrators," *id.* at 377.

About two weeks later, Klinkhardt submitted an updated version of Hurry's notice and "responses to [the FDIC's] letter." *Id.* at 381. In response to the agency's request for proof of funds, Hurry's updated notice explained that the prior notice mistakenly included the $1,000,000 injection of equity as part of the purchase price. *Id.* By removing that amount, the updated notice listed the purchase price as "$2,168,775," *id.* at 425, to "reflect only the acquisition of [certain] shares," *id.* at 381. The updated notice also included a letter from "the Trust's attorney," Richard Nummi, indicating "that the[] funds [in the SunTrust account] are held for the benefit of Mrs. Hurry and are available for her investment use." *Id.* Nummi's letter, in turn, stated that "Mr. and Mrs. Hurry currently maintain a trust balance of approximately 2.5 million dollars with our firm" and that "[t]his amount is unencumbered by any current obligation and is withdrawable at any time for any purpose." *Id.* at 390. Regarding Hurry's business affiliations, Klinkhardt asserted that Hurry "has no direct ownership" in the 46 companies and that "[u]nder these circumstances, the requested documentation would not be germane to the question of

10

whether Mrs. Hurry is qualified to acquire control of the Bank and would cause undue burden and delay given that the deadline to acquire the Bank shares is March 31, 2018."[1] *Id.* at 383.

On January 12, 2018, the FDIC again returned Hurry's notice as "incomplete and insufficient for the FDIC's consideration." Dkt. 29-1 at 1. This time, before listing the missing information, the FDIC cited its authority to disapprove a notice under the CBCA, explaining that "[p]ursuant to 12 U.S.C. § 1817(j), a Notice shall contain" the information listed in § 1817(j)(6). *Id.* The FDIC also asserted that it "may disapprove a Notice, if among other things, the acquirer neglects, fails, or refuses to furnish to the FDIC all information required by the FDIC." *Id.*; *see also* 12 U.S.C. § 1817(j)(7)(E). And the FDIC cautioned that it "ha[d] provided [Hurry] on numerous occasions, both verbally and in writing, the information that is necessary for the Notice to be considered complete." Dkt. 29-1 at 1.

Turning to the information missing from the second notice, the FDIC indicated that "[m]any of the items [it] outlined in [its] December 8, 2017, letter remain unaddressed or lack sufficient information and explanation," and it offered "additional detail . . . to further clarify incomplete items." *Id.* at 2. On the proof of funds issue, the FDIC reiterated that the "SunTrust bank statement . . . lack[ed] any personally identifiable information" that would permit the agency to conclude that the funds belonged to Hurry, and it further stated that the Nummi letter "[did] not provide any information regarding Ms. Hurry's right and access to the trust funds." *Id.* at 2–3. On the business affiliations issue, the FDIC repeated its request for "the corresponding trust documentation, . . . including controlling and beneficial interests,

---

[1] Hurry's purchase agreement contained a termination clause that allowed either party to breach the agreement, without penalty, if the transaction was not completed by March 31, 2018. Dkt. 29 at 138. Although that date passed before Hurry brought this suit, she has represented to the Court that she still intends to proceed with the transaction and that her dispute with the FDIC is not moot. *See* Dkt. 19 at 1.

administrators, and trustees." *Id.* at 4.  According to the FDIC, "[t]his documentation is pertinent to the assessment due to the closely related nature of the trust, business affiliations, and Ms. Hurry's financial capacity to complete the proposed transaction." *Id.*

On January 25 and February 23, 2018, Klinkhardt and Hurry's attorney, David Baris, conferred with the FDIC. *Id.* at 8–11.  According to an FDIC memorandum, during the first call the parties "went through the January 12[] letter, bullet-by-bullet, to ensure [that] Mr. Klinkhardt and Mr. Baris understood the requested items, and [the FDIC] expanded on why the information was necessary." *Id.* at 8.  The memorandum further recounts that "[t]here was lengthy discussion regarding the trust documentation, affiliate information, interagency biographical and financial report . . . clarifications, and business plan revisions." *Id.*  A separate FDIC memorandum reports that the second call focused on trust documentation and affiliate information. *Id.* at 10–11.  Among other things, Hurry's counsel "stated [that] beneficial interest is not included in the [relevant] definition, and therefore, should not require Ms. Hurry to list all trust entity ownership percentages." *Id.* at 11.  An FDIC representative asked whether the trusts were revocable or irrevocable, and Hurry's representative responded that "there were at least three trusts, two irrevocable . . . and a revocable trust." *Id.*  An FDIC representative then stated that Hurry should "respond to the question [posed in the Interagency Biographical and Financial Report] transparently and [that] additional information may be requested, if the application is otherwise deemed substantially complete." *Id.*

On March 9, 2018, Klinkhardt submitted "responses to [the January 12 letter]" and a third updated version of Hurry's notice. *Id.* at 12.  This submission included a new letter from Nummi, the trust lawer; a new account statement from SunTrust that included a balance of more than $3 million; and copies of the "Trust Certification" and "Trust Agreement" for the "Hurry

Family Revocable Trust." *Id.* at 24–30. The submission also include a revised list of "entities with which Ms. Hurry is associated," which included only five of the original 46 companies and indicated that Hurry had a 0% ownership interest in each, except that BRICFM LLC was owned "100% through Hurry Family Revocable Trust." *Id.* at 15. The submission explained that "[i]n previous Notices, Mrs. Hurry listed companies she believed may have been controlled by other irrevocable trusts." *Id.* at 16. Her updated notice included only the five companies, however, because "[c]urrently those [other] entities[,] including the trusts[,] are being managed by others" and because "[Hurry] is currently only, indirectly, managing the [five] companies listed above." *Id.* The updated submission also disputed Hurry's "affiliation" with the previously listed companies under relevant law; asserted that "[t]he trusts are private to the family and are not related to this application in any way"; and noted that "Mrs. Hurry has a heightened concern about the FDIC and state maintaining the confidentiality of her submissions." *Id.* Although Hurry was "willing to completely remove herself as an inactive management-trustee should the FDIC require such as a consideration for approval," she "fe[lt] that [was] unfair and discriminatory based on her responsibility as a mother and wife with responsibility to her family that [did] not concern this bank purchase in any way." *Id.*

The FDIC was not satisfied. On March 23, 2018, the agency again wrote to Hurry's representative, asserting that "before [the FDIC is] able to accept the [third] application for processing[,] [it] need[s] additional information." *Id.* at 294. With respect to proof of funds, the FDIC stated that although it was "able to determine Ms. Hurry's right and access to The Hurry Family Revocable Trust's funds" because of the newly submitted Trust Certificate and Trust Agreement, the "transaction activity and cover letter provided by Mr. Nummi [was] inadequate to substantiate the source of funds." *Id.* (quotation marks omitted). The FDIC, accordingly,

13

requested that Hurry "provide adequate proof of available funds that clearly states the account owner" and that she include account verification documentation containing "personally identifiable information (e.g.[,] The Hurry Family Revocable Trust) to determine the source of funds for the acquisition." *Id.*

As for Hurry's business affiliations, the FDIC repeated its request for "a comprehensive list of Ms. Hurry's associations and affiliations, as well as the related trust documentations." *Id.* According to the agency, "[t]he Interagency Biographical and Financial Report instructions define[] a principal shareholder or owner as a person who directly or *indirectly* owns, controls, or holds . . . the power to vote 10 percent or more of equity interest of an entity." *Id.* And, "[t]he subject Notice state[d] Ms. Hurry is a trustee of the irrevocable trust(s), which indicates control." *Id.* The FDIC informed Hurry's representative that "[i]f the [requested] information is not provided . . . by April 2, 2018, we will conclude you do not want to furnish the requested information as it has been previously requested." *Id*. at 295.

Between March 30 and July 24, 2018, Hurry's representatives and the FDIC traded letters reiterating their respective positions. To "clarify[] the availability of funds," *id.* at 296, Hurry's representatives submitted additional records, including another letter from Nummi, *see id.* at 300; a copy of a document indicating his good standing with the Florida Bar, *see id.* at 316; and copies of Florida State Bar "Rules Regulating Trust Accounts," which they believed would help the FDIC "gain a better understanding of [their] confusion over [its] insistence that adequate proof of funds and their source have not been met," *id.* at 312–13. On the business affiliations issue, Hurry's representatives disputed the materiality of the FDIC's request, asserting that it "appear[ed] to be based on merely an inquisitiveness of the terms of these irrevocable trusts which have no pertinence to her plans to purchase the Bank's shares personally" and that "the

FDIC lacks the power under [the CBCA] to require her to provide the documentation relating to such trusts." *Id.* at 297.

Meanwhile, FDIC staff began to consider how to handle the situation.  On April 24, 2018, John R. Jilovee, Deputy Regional Director for the FDIC's Kansas City Regional Office, wrote a memorandum about Hurry's pending notice to Patricia A. Colohan, Associate Director for Risk Management and Applications.  *Id.* at 305–07.  The memorandum observed that Hurry's "most recent submission"—that is, her third notice—was "improved" but "still lack[ed] sufficient information to assess Ms. Hurry's business affiliations and to substantiate the source of funds for her acquisition."  *Id.* at 305.  The memorandum went on to explain that the FDIC's Kansas City Regional Office was "seeking guidance on how to proceed," and that it was considering "the following options:" (1) "Return the Notice"; (2) "Treat the Notice as 'abandoned' within the meaning of 12 C.F.R. § 303.11(e)"; (3) "Issue another letter and/or conference call requesting the necessary information"; (4) "Treat the Notice as substantially complete for purposes of [the CBCA] and begin the background investigation"; or (5) "Recommend denial of the Notice, providing Ms. Hurry an opportunity to withdraw the Notice." *Id.* at 306.

On May 30, 2018, "a conference call was held" among FDIC personnel "to confer with the Washington Office on how to proceed as Ms. Hurry refused to provide further information requested by the [Kansas City Office] to support her Notice."  *Id.* at 308.  The participants concluded that the "information . . . requested is critical to [the FDIC's] analysis."  *Id.*  "As such," they agreed that "the filing [was] not complete, and the [Kansas City Office] w[ould] send another letter requesting the source of funds and affiliate information."  *Id.*  If Hurry did not comply "within the prescribed timeframe, . . . the filing should be returned pursuant to 12 C.F.R.

303.11(e)," *id.*, which allows the agency to treat "filing[s]" as "abandoned" if the agency requests information and that information "is not provided within the time period specified by the agency," 12 C.F.R. § 303.11(e).

On June 1, 2018, the FDIC wrote to Hurry's representative, stressing that Hurry had yet to provide all of the information the FDIC had requested, despite the "numerous occasions" on which the FDIC staff had explained "why each request [was] necessary." Dkt. 29-1 at 309. The FDIC then reiterated its request for "proof of available funds" and "a comprehensive list of Ms. Hurry's associations and affiliations, as well as the related trust documentation"; provided a deadline of June 30, 2018; and asserted that if Hurry did not "furnish the requested information by that date," the filing would be "returned pursuant to 12 C.F.R. 303.11(e)." *Id.* at 309–10.

Hurry's representative responded on June 26, 2018, providing "clarification" regarding the source of funds for the acquisition, *id.* at 311, and, on July 1, 2018, her lawyer wrote to the FDIC, providing additional legal argument regarding the agency's request for information relating to the family trusts, *id.* at 318–20. Among things, her lawyer stressed that, "as a beneficiary of the irrevocable trusts," Hurry "has no control over those trusts." *Id.* at 319. He further argued: "The trusts are not affiliated with Mrs. Hurry based on her being a beneficiary for purposes of Section 23A and B of the Federal Reserve Act, nor are they related interests of Mrs. Hurry under Regulation O." *Id.* at 319–20. Moreover, the lawyer further argued, Hurry was not at liberty "to provide [the requested] trust documentation since it would violate the privacy rights of those involved in the trust and such persons will not release that documentation." *Id.* at 320. In lieu of providing the trust documentation, Hurry's lawyer indicated that she would agree as a condition of the agency's "non-objection to the Notice" to maintain only a "passive" interest in

the trusts and that she would "step down from any role as a trustee at the time she consummates the change of control." *Id.*

Through these various exchanges, Hurry made some progress but not enough.  On July 24, 2018, the FDIC responded to the letters from Hurry's representatives, (apparently) concluding that she had "address[ed] the source of funds for the proposed transaction." *Id.* at 372.  But the agency remained unpersuaded with respect to the requested "documentation concerning the irrevocable trusts." *Id.*  The FDIC reiterated its view that "this information is needed to complete a review of Ms. Hurry's competence, experience, integrity, and financial ability pursuant to 12 U.S.C. § 1817(j)." *Id.*  Thus, once again, the agency returned "the filing as incomplete because the applicant has not submitted . . . the needed information." *Id.*

Having reached an impasse with respect to the irrevocable trust documentation, Hurry's lawyer wrote to the agency on August 9, 2018, "respectfully request[ing] that the [FDIC] make a final decision on the notice of change of control by August 17, 2018, based on the information previously provided." *Id.* at 373.  He repeated Hurry's contention that the trust documentation was "not relevant or required" and that it was "not within Ms. Hurry's control to provide." *Id.* And, according to Hurry's counsel, "[t]he long and unreasonable delays in making a final decision on the notice of control [were] concerning for many reasons," including that "the time for the FDIC to disapprove the notice [under the CBCA] . . . passed many months ago" and that the process had "also deprived Ms. Hurry of her statutory right in the [CBCA] to challenge any denial of the notice." *Id.* at 374.

On August 16 and September 7, 2018, FDIC personnel held two more conference calls to determine how to respond.  A memorandum memorializing the first call states that, "[t]echnically, there [was] not a Notice outstanding because it was again returned; however, the

[Baris] letter appears to be a resubmission of the package evaluated over the past several months." *Id.* at 375.  During the second call, FDIC Senior Counsel Mark G. Flanigan stated that "the return [of the notice] was a final agency action," and, thus, there was "not an active Notice outstanding." *Id.* at 390.  "As such, it was determined" that the agency would "send another letter stating the file was closed pursuant to 12 C.F.R. 303.11(e)." *Id.*

Hurry's attorney sent one final letter to the FDIC on September 10, 2018, indicating that Hurry had "not yet received a written response" to his August 8 request for a final decision. *Id.* at 391.  "Time remains of the essence," the lawyer wrote, "because . . . the sellers of Bank of Orrick voting stock now have a right to terminate unilaterally the purchase agreement with Ms. Hurry." *Id.* at 392.  He, accordingly, requested "a decision from the FDIC on or before September 17, 2018." *Id.*

On September 19, 2018—306 days after Hurry first submitted her notice of change in bank control to the FDIC—the agency wrote to Hurry's lawyer.  That determination, which forms the basis of Hurry's challenge in this case, stated in relevant part:

> We received your August 9, 2018 letter requesting a final Agency action on the March 13, 2018, Notice; however, as detailed in our letter dated July 24, 2018, we returned the Notice as incomplete.  Despite multiple requests, Ms. Hurry failed to furnish this office with all the information needed to complete a review of her competence, experience, integrity, and financial ability pursuant to 12 U.S.C. § 1817(j).  The filed has been closed pursuant to 12 C.F.R. § 303.11(e), for the subject Notice.
>
> We also received your letter dated September 10, 2018, which included proposed conditions to which Ms. Hurry would agree in order to receive favorable consideration of the Notice; however, any discussion of nonstandard conditions is premature at this point.  As previously explained, we needed the information requested in our various letters to complete an assessment of Ms. Hurry's competence, experience, integrity, and financial ability in accordance with applicable statutory requirements.  If Ms. Hurry chooses to again submit a Notice, it must be with the understanding that she is responsible for providing the requested information.

*Id.* at 393.

### C.    Procedural Background

Hurry filed this lawsuit on October 24, 2018.  *See* Dkt. 1.  Her initial complaint asserted

only one count: "Failure to Take Action in Accordance with Law" under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 706(1), and the CBCA, 12 U.S.C. § 1817(j).  Dkt. 1 at 18–19

(Compl. ¶¶ 59–71).  According to Hurry's complaint, the FDIC withheld or unreasonably

delayed action with respect to her notice because, in her view, the CBCA "requires the FDIC to

either disapprove an acquiring person's Notice or approve it" within the statutory timeframe, and

the FDIC failed to do so.  *Id.* at 19 (Compl. ¶¶ 60–66).  She sought (1) a declaration that the

FDIC had "unreasonably delayed rendering a decision" on her notice; (2) a declaration that the

FDIC's "failure to disapprove the transaction . . . enables Hurry to proceed with the transaction";

and (3) injunctive relief compelling the FDIC to "take action promptly . . . confirming that the

transaction may proceed or stating its purported basis for disapproving the transaction."  Dkt. 1

at 21 (Compl.).

At an initial scheduling conference, the parties agreed to a schedule for filing amended

pleadings and cross-motions for summary judgment.  *See* Minute Entry (February 4, 2019).

Those deadlines passed without any action from Hurry.  On July 16, 2019, the FDIC moved to

dismiss the complaint as moot and for failure to prosecute.  *See* Dkt. 14.  As to mootness, the

FDIC argued that Hurry's claim under Section 706(1) was moot because the agency had already

taken action by "finding the Notice abandoned under 12 C.F.R. § 303.11(e)."  Dkt. 14 at 2–3; *see*

*also id.* at 5–6.  Thus, according to the FDIC, there was no action for the Court to compel

because the agency had already acted.  Regarding the failure to prosecute, the FDIC argued that

the Court should dismiss the case because Hurry failed to amend her complaint or to move for summary judgment, despite the previously agreed-upon or court-ordered deadlines.  *Id.* at 7–8.

The Court rejected the FDIC's mootness and failure to prosecute arguments and denied the agency's motion to dismiss.  *Hurry v. Fed. Deposit Ins. Corp.*, No. 18-2435, 2020 WL 2838567, at *1, *6 (D.D.C. May 31, 2020).  But in doing so, the Court cautioned the parties that their respective positions were "ill-defined" because the parties had failed to address the central issues in the case.  *Id.* at *4.  For her part, Hurry had sought relief under Section 706(1) for the FDIC's alleged failure to act, and although that claim was not moot, *see id.* at *4–5, the complaint, as drafted, failed to challenge what the agency actually did: it rejected her notice as incomplete and closed her file as abandoned, Dkt. 29-1 at 393; *see also Hurry*, 2020 WL 2838567, at *4.  The FDIC, on the other hand, had not addressed whether the CBCA authorized the agency to return Hurry's notice as incomplete and to close her case.  *See Hurry*, 2020 WL 2838567, at *6.

On July 21, 2020, the Court held a pre-motion conference regarding the parties' anticipated cross-motions for summary judgment.  Having reviewed the parties' pre-motion submissions, the Court conveyed a concern that the parties were still "talking past each other," due, in part, to the fact that Hurry continued to frame her complaint as a challenge under Section 706(1) to agency action withheld or unreasonably delayed.  Hrg. Tr. (Rough at 9).  Counsel for Hurry clarified at the hearing that the question Hurry intended to raise was "whether agency regulations permit [the FDIC] effectively to ignore the clear language and process of the statute."  *Id.* at 13.  The Court, accordingly, granted Hurry leave to amend her complaint to clarify her claims.  *Id.* at 16; *see also* Minute Entry (July 21, 2020).

Hurry amended her complaint on August 4, 2020.  *See* Dkt. 22 (Am. Compl.).  In Count I, she once again asserts a claim under Section 706(1) for agency action withheld or unreasonably delayed.  Dkt. 22 at 17 (Am. Compl. ¶¶ 55–65).  In her view, the FDIC was duty-bound to render a decision approving or disapproving the proposed transaction within the statutorily defined period, and it failed to satisfy that obligation.  *Id.* at 18 (Am. Compl. ¶¶ 57–63).  In Count II, she now alleges that the FDIC acted arbitrarily, capriciously, and contrary to law, in violation of 5 U.S.C. § 706(2), when it closed Hurry's file and "deem[ed] it abandoned." *Id.* at 19 (Am. Compl. ¶¶ 66–69).  In particular, she alleges that the FDIC has "no lawful basis or authority to deviate from the provisions and procedures set forth in [the CBCA]."  *Id.* (Am. Compl. ¶ 68).  And, in Count III, she alleges that the FDIC acted arbitrarily and capriciously by "demonstrat[ing] an inappropriate and arbitrary interest in [her] husband" by seeking information about his financial activities and "ma[king] the discriminatory assumption that [he] would have control of [Plaintiff's] investment."  *Id.* at 20 (Am. Compl. ¶ 71).  In addition to the relief sought in her original complaint, Hurry seeks a declaration that 12 C.F.R. § 303.11(e) is "contrary to the governing statute."  Dkt. 22 at 21 (Compl.).

The parties' cross-motions for summary judgment are now before the Court.  *See* Dkt. 23; Dkt. 24.

## II.  LEGAL STANDARDS

In an APA case, "the district judge sits as an appellate tribunal," and "the entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks omitted).  Summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'"

*Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).

This case involves three APA standards of review.  First, Section 706(1) provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  "[A] claim under [Section] 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Ut. Wilderness All.* (*SUWA*), 542 U.S. 55, 64 (2004).  Second, Section 706(2) provides that a reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The scope of the Court's review under this standard is "narrow."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "When reviewing an agency action" under Section 706(2)(A), the Court "must assess, among other matters, 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (quoting *State Farm*, 463 U.S. at 43).  Third, when an agency interprets a statute that it is charged with administering, the Court must apply the two-step framework established in *Chevron v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron* step one, the Court must consider "whether Congress has directly spoken to the precise question at issue."  *Id*. at 842.  "If the intent of Congress is clear, that is the end of the matter."  *Id.*  But, if after applying the traditional tools of statutory interpretation, the Court concludes that Congress has left a gap for the agency to fill, then the Court must proceed to *Chevron* step two and defer to the agency's interpretation if it constitutes "a permissible construction of the statute."  *Id.* at 843.

# III.  ANALYSIS

## A.     Agency Action Unlawfully Withheld or Unreasonably Delayed

As the Court foreshadowed in its earlier opinion and at the pre-motion conference on the pending motions, Hurry's framing of her challenge under Section 706(1) misses the mark.  A claim under Section 706(1) "can proceed *only* when" an agency has "failed to take a discrete . . . action that it is *required* to take."  *SUWA*, 542 U.S. at 63–64 (emphases added and omitted).  Hurry argues that "it is undisputed that the FDIC did not disapprove the Notice within the time prescribed in the statute," and she further argues that, "[f]or that reason alone, judgment should be entered on Hurry's first cause of action" under Section 706(1).  Dkt. 23-1 at 4.  The CBCA, however, "does not require any agency action."  *Hurry*, 2020 WL 2838567, at *4.  The statute provides that "[n]o person . . . shall acquire control of" a bank "*unless* the appropriate Federal banking agency has been given sixty days'" notice and it "has *not issued* a notice disapproving the proposed acquisition."  12 U.S.C. § 1817(j)(1) (emphases added).  The upshot is that the agency is under no obligation to act on a notice; the default rule is that, if the agency does nothing, the acquisition may proceed.

If the agency wants to prevent an acquisition from proceeding, it must issue a notice of disapproval before the statutory deadline.  But that is not what the FDIC did here.  Had it done so, Hurry would have had the right to an administrative hearing, and at the conclusion of that hearing, the FDIC would have been required to issue an order approving or disapproving the acquisition.  12 U.S.C. § 1817(j)(4).  At that point, the agency would have had a discrete, non-discretionary duty to act—that is, to approve or disapprove the transaction.  That duty, however, does not arise unless and until the agency initially disapproves the acquisition, triggering the right to a hearing.  And, here, the FDIC never disapproved the transaction.

Even more to the point, the FDIC did act here—it returned Hurry's notice as incomplete and closed her case, thereby preventing her from acquiring a controlling interest in the Bank of Orrick.  According to Hurry, the agency's decision to return her notice as incomplete and to close her file as abandoned is the equivalent of a failure to act; the FDIC, in her view, is "*required* to address a Notice that advises the [agency] of [a] proposed transaction and [that] contains the information called for by the [agency's] forms," and the agency's refusal even to accept the notice constitutes a failure to act.  Dkt. 23-1 at 17.  But that is not quite right.  Putting aside for the moment the question whether the agency acted lawfully when it returned Hurry's notice and closed her file as abandoned, the FDIC did act.  It reviewed her notice, concluded that it was not substantially complete under the terms of the statute and governing regulations, and it rendered a final determination closing her file on the ground that Hurry had failed to cure the deficiencies the agency identified in her notice.  That is agency action, and thus Hurry's request to compel agency action wrongfully withheld fails.

The Court will, accordingly, **DENY** Hurry's motion for summary judgment on Count I and will **GRANT** the FDIC's cross-motion for summary judgment on Count I.

**B.    Lawfulness of Decision to Return Notice and to Close File**

1.    *Scope and Standard of Review*

Before turning to the merits of Count II of Hurry's Amended Complaint, the Court pauses to clarify what is—and what is not—at issue.  To start, this case does not implicate the validity of the FDIC's "substantially complete" regulation.  That regulation provides in relevant part:

> (b)    **Commencement of the 60-day notice period: consummation of acquisition**.

> (1)     The 60-day notice period . . . shall commence on the day after the
> date of acceptance of a substantially complete notice by the
> appropriate regional director.  The notificant(s) may consummate
> the proposed acquisition after the expiration of the 60-day notice
> period, unless the FDIC disapproves the proposed acquisition or
> extends the notice period as provided in the CBCA.

12 C.F.R. § 303.86(b).  Hurry does not challenge the validity of the regulation, nor is the

lawfulness of the regulation necessarily implicated by the challenge she does bring.  To be sure,

Hurry does argue that the FDIC erred in returning her notice on the ground that it was not

"substantially complete."  But the regulation does not define the phrase "substantially complete,"

and nothing in this case calls into question the FDIC's authority—*at least at times*—to return a

notice that lacks certain essential matter, such as, for example, the required certification or a

basic description of the proposed acquisition.  The central question presented here is whether—

*on the facts of this case*—the FDIC acted contrary to the CBCA when it returned Hurry's notice

based on a legal dispute with her counsel regarding the materiality of documentation relating to

two irrevocable trusts.  Nothing in the "substantially complete" regulation speaks to that

question, and, even if the Court concludes that the FDIC acted unlawfully in returning Hurry's

notice, that conclusion would not require invalidation of the "substantially complete" regulation.

What Hurry does challenge is the FDIC's September 19, 2018 final determination closing

her "file" as abandoned, Dkt. 29-1 at 393, and the validity of the FDIC's abandonment

regulation, 12 C.F.R. § 303.11(e), but only as applied to the facts of this case.  *See* Dkt. 22 at 19

(Amd. Compl. ¶¶ 67–69).  By challenging the agency's final determination, moreover, Hurry

also challenges "the intermediate actions leading up to that final action."  *Benzman v. Whitman*,

523 F.3d 119, 132 (2d Cir. 2008); *see also* 5 U.S.C. § 704 ("A preliminary, procedural, or

intermediate agency action or ruling not directly reviewable is subject to review on the review of

the final agency action.").  Here, those intermediate actions include the agency's multiple letters

returning Hurry's various notices as "incomplete."  *See, e.g.*, Dkt. 29-1 at 393 (referencing the intermediate action returning March 13, 2018 notice and August 9, 2018 letter requesting a final agency action).  In the last of these letters, the FDIC noted the disagreement between Hurry's counsel and the FDIC regarding the relevance and materiality of "documentation concerning the irrevocable trusts"; explained that "this information is needed to complete a review of Ms. Hurry's competence, experience, integrity, and financial ability pursuant to 12 U.S.C. § 1817(j)"; and returned "the filing as incomplete because the applicant ha[d] not submitted . . . the needed information."  Dkt. 29-1 at 372.

In Hurry's view, the FDIC acted "contrary to the plain language of the [CBCA]" when it determined that her March 13, 2018 notice was "incomplete" and then deemed it "abandoned" after she failed to provide all of the requested information.  Dkt. 23-1 at 4.  To the extent the "abandonment" regulation purports to authorize the agency to "deem [her] file 'abandoned'" merely because she declined to provide the agency with all of the information that it requested, *id.* at 22, moreover, Hurry maintains that the regulation "contravenes the statute . . . and is invalid," *id.* at 24.  Under the FDIC abandonment regulation, if a "filing" omits any "information set forth in the applicable subpart of" the FDIC regulations, or if "an applicant" fails to provide any "additional information" requested by the agency "within the time period specified by the agency, the FDIC may deem the filing abandoned" and may "close[]" the file.  12 C.F.R. § 303.11(e).  Notably, the "abandonment" regulation applies generically to all FDIC filings, and the Court has no reason to consider whether it is lawful in any setting beyond that presented here. But the FDIC invoked the regulation in support of its final determination, and thus the Court must consider whether that application of the regulation is consistent with the CBCA.  In Hurry's view, the regulation—as applied—is at odds with the plain language and structure of the CBCA.

The Court must, accordingly, decide whether the FDIC acted in contravention of the CBCA when it returned Hurry's March 13, 2018 notice on July 24, 2018, Dkt. 29-1 at 372, and then, on September 19, 2018, declined Hurry's request for a decision on the merits of her notice and, instead, closed her file as abandoned pursuant to 12 C.F.R. § 303.11(e).  Although Hurry frames her challenge under the APA's arbitrary and capricious standard, the question whether an "agency's construction of the statute" it is charged with implementing "is based on a permissible construction of the statute" is typically governed by the *Chevron* framework.  *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 91–92 (D.C. Cir. 2020) (quotation marks and citations omitted).  Under that framework, the Court must first consider whether Congress has delegated interpretative authority to the agency and whether Congress intended for the mode of interpretation at issue—*e.g*, notice-and-comment rulemaking or a letter ruling—to carry "the force of law."  *United States v. Mead Corp*., 533 U.S. 218, 230–32 (2001).  If so, the Court must then proceed to *Chevron* step one, which requires the Court to apply the "traditional tools of statutory interpretation—text, structure, purpose, and legislative history," *Pharm. Rsch. & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001), to determine "whether Congress has directly spoken to the precise question at issue[,]" *Chevron*, 467 U.S. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.  Only if the Court concludes that Congress has left a "gap" for the agency to fill must the Court proceed to *Chevron* step two, which asks "whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  This final step in the *Chevron* framework overlaps with the APA's arbitrary and capricious standard "because under *Chevron* step two, [the court asks] whether an agency

interpretation is arbitrary and capricious in substance." *Judulang v. Holder*, 565 U.S. at 52 n.7; *see also Agape Church, Inc. v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013).

Here, Hurry challenges two separate modes of interpretation—(1) the FDIC's letters, first returning her various notices as incomplete and ultimately closing her file as abandoned, and (2) the agency's abandonment regulation.  It is unlikely that the first mode of interpretation—which lacked any indicia of "formal administrative procedure" and did not purport to bind third parties or to have any precedential force—warrants *Chevron* deference, while the second—which involved notice-and-comment rulemaking—almost certainly does.  *See Mead Corp.*, 533 U.S. at 227–34; *see also Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011).  But, even with respect to the abandonment regulation, it is far from clear that, when the FDIC adopted that generally applicable rule, it made a considered judgment that the CBCA should be construed to authorize the agency to deem a notice of proposed acquisition abandoned if the notice fails to "contain *all* information," 12 C.F.R. § 303.11(e) (emphasis added), "required by paragraph 6 of the CBCA," *id.* § 303.85(a), as well as any "*additional* information" requested by the FDIC, *id.* § 303.11(e) (emphasis added).  To the contrary, the record of the rulemaking contains no indication that the agency ever considered—or intended to adopt—such a construction of the CBCA.  *See*, *e.g.*, Proposed Rules, Federal Deposit Insurance Corporation: 12 C.F.R. Parts 303, 337, 341, 346, 348, and 359, 62 Fed. Reg. 52,810, 52,813–14 (Oct. 9, 1997).

Finally, it is far from clear that either the agency's letters to Hurry or the abandonment regulation include the interpretative step that the FDIC now urges the Court to adopt—that is, that the CBCA defines the phrase "a written notice of [a] proposed acquisition" to mean a filing that contains all of the information listed in Paragraph 6 of the CBCA, 12 U.S.C. § 1817(j)(1)–(6).  In its brief, the FDIC argues that Hurry's "submission . . . was not a 'notice' under the

CBCA" because it failed to "contain" substantially all of the information required under Paragraph 6—including "[a]ny additional relevant information in such form as the appropriate Federal banking agency may require"—and, thus, the 60-day clock never began to run.  Dkt. 24 at 7–8 (quoting 12 U.S.C. § 1817(j)(6)(H)).  But that is not what the FDIC's letters or the abandonment regulation say.  The letters assert that additional information was necessary to "complete a review," Dkt. 29-1 at 372, 393, and that the CBCA specifies what information the notice "shall contain," *id.* at 309.  The abandonment regulation follows a similar path, providing that "[a] filing must contain all information" otherwise required.  12 C.F.R. § 303.11(e).  The FDIC's briefs go beyond the letters' assertions and the regulation's requirement, positing that a filing that lacks substantially all the required information fails to clear this definitional hurdle; in short, it is not merely an "incomplete" notice, it is not a "notice" at all.  *See* Dkt. 24 at 8; *but see* Dkt. 29-1 at 393 (describing Hurry's filing as a "Notice," which the agency had returned as incomplete).  But, to the extent the FDIC's definitional argument was raised for the first time in the FDIC's briefs, it is—at best—uncertain that it would warrant deference.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

These questions, however, are ultimately of no consequence because, as explained below, even assuming that the FDIC's interpretation of the statute is entitled to *Chevron* deference, it fails at both steps one and two.

    2.    *CBCA*

In a "statutory construction case," like this one, the Court must "start . . . with the statutory text."  *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quotation marks and citation omitted).  In most respects, the text of the CBCA is both clear and undisputed.  It provides that

"[n]o person" may "acquire control of any insured depository institution . . . unless the appropriate Federal banking agency has been given sixty days' [and, if extended, up to 180 days'] prior written notice of [the] proposed acquisition and within that time period the agency has not issued a notice disapproving the proposed acquisition." 12 U.S.C. § 1817(j)(1). Accepting this text for what it says, Hurry and the FDIC agree that the agency has 60 days (or, if extended, up to 180 days) to give "notice disapproving of the proposed acquisition," *id.*, and, if it fails to do so, the acquisition may proceed.  So far, so good.

The FDIC, however, reads a key limitation into the statute that Hurry does not.  In the FDIC's view, the CBCA's time limits and disapproval provisions apply only after the agency has received a "notice," and Paragraph 6 of the statute specifies that "a notice filed pursuant" to the change of control subsection "shall contain" seven different categories of information, including the catch-all item for "[a]ny additional relevant information in such form as the [FDIC] may require."  12 U.S.C. § 1817(j)(6)(H).  The FDIC's implementing regulations, in turn, reaffirm that "[a] notice . . . shall be filed with the appropriate FDIC office and shall contain all the information required by Paragraph 6 of the CBCA."  12 C.F.R. § 303.85(a)(1).  Thus, as the FDIC tells it, "Hurry never submitted a 'notice' to the agency under the CBCA that would trigger the sixty-day disapproval clock" because she failed to provide the agency with all of the "additional relevant information" that it requested.  Dkt. 24 at 13–14.  Or, more precisely, Hurry's "submission . . . was not a 'notice' under the CBCA" because she "failed to provide relevant FDIC-required trust information" to the agency.  *Id.* at 8.

Although not cited by either party, the FDIC's position finds some support in the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018).  That decision considered whether a "notice to appear" for an immigration removal proceeding that fails to

specify when and where the noncitizen must appear is, in fact, a "notice to appear" at all.  Under

the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), the

Attorney General may "cancel [the] removal" of a noncitizen if, among other things, she applies

for cancellation and can show that she has been physically present in the United States for a

continuous period of "not less than 10 years." *Id.* at 2110 (citing 8 U.S.C. § 1229b(b)(1)(A)).

But under the "stop-time rule," any period of "continuous physical presence" shall be deemed to

end when a noncitizen is served a "notice to appear" for removal hearings under 8 U.S.C.

§ 1229(a).  *Id.*  Section 1229(a)(1), in turn, states that a notice to appear "shall . . . specify[]"

among other things, the "time and place" of the removal proceedings.  *Id.* § 1229(a)(1)(G)(i).

The question in *Pereira* was whether the government could trigger the stop-time rule by serving

a noncitizen with a notice to appear that failed to specify the time and place of the removal

hearings.  138 S. Ct. at 2110.

　　　　Relying on "[t]he statutory text" and "common sense," the Supreme Court held that, at a

bare minimum, the phrase "notice to appear" refers to a "'written notice . . . specifying . . . [t]he

time and place at which the [removal] proceeding will be held.'"  *Id.* at 2114–15 (quoting 8

U.S.C. § 1229(a)(1)(G)(i)).  As the Court observed, Section 1229(a) employs "quintessential

definitional language"—it tells the reader that the "written notice . . . specifying," among other

things, the time and place of the proceeding shall be "*referred to* as a 'notice to appear.'"  *Id.* at

2114, 2116 (quotation marks omitted) (emphasis added).  That reading of the statute, moreover,

comports with "common sense."  *Id.* at 2115.  "If the three words 'notice to appear' mean

anything in this context," the Court explained, "they must mean that, at a minimum, the

Government has to provide noncitizens 'notice' of the information, *i.e.*, the 'time' and 'place,'

that would enable them 'to appear' at the removal hearing in the first place."  *Id.*  And because

notice of a proceeding is meaningless without notice of when and where the proceeding will occur, the Court rejected the dissent's contention that a "defective notice to appear is still a 'notice to appear' even if it is incomplete—much like a three-wheeled Chevy is still a car." *Id.* at 2116. Unlike the missing wheel, the Court reasoned, "[f]ailing to specify integral information like the time and place of removal proceedings unquestionably would 'deprive [the notice to appear] of its essential character.'" *Id.* at 2116–17 (citation omitted).

The statutory scheme in *Pereira* bears at least a superficial similarity the CBCA. Both statutes, for example, specify what a "notice" or "notice to appear" shall contain, and neither explicitly addresses whether a complete notice is required to trigger the 60-day clock in the CBCA context or to the stop-time rule in the IIRIRA. IIRIRA states that a notice to appear "shall be given . . . specifying the following:" and then lists information that a notice to appear must include. 28 U.S.C.§ 1229(a)(1). And, likewise, Paragraph 6 of the CBCA states that "a notice filed pursuant to this subsection shall contain the following information:" and lists the information that a notice must include. 12 U.S.C. § 1817(j)(6). But the similarities stop there, and, as explained below, the Court is unconvinced that the CBCA defines the phrase "prior written notice of [the] proposed acquisition" to mean a notice that contains all information identified in Paragraph 6, including any "additional relevant information" that the banking agency may request, 12 U.S.C. § 1817(j)(6).

Starting with Section 1817(j)(1), the CBCA provides that the 60-day clock starts when the federal banking agency receives "written notice of [the] proposed acquisition." 12 C.F.R. § 1817(j)(1). That language differs markedly from the language at issue in *Pereira*. As the Supreme Court observed in *Pereira*, omitting the time and place of a proceeding from a notice to appear would "deprive [the notice to appear] of its essential character." 138 S. Ct. at 2116–17.

Omitting information relating to two irrevocable trusts from a "notice of [a] proposed acquisition" of an "insured depository institution," in contrast, poses no such difficulty. Similarly, while the text at issue in *Pereira* used "quintessential definitional language"—that is, "referred to as a 'notice to appear,'" *id.* at 2116—no similar language appears in the CBCA.  To the contrary, Section 1817(j)(1) does not even cross-reference Paragraph 6, and Paragraph 6 merely describes what the notice "shall contain."  12 U.S.C. § 1817(j)(1), (6).

The real difficulty for the FDIC, however, begins when the Court looks to other portions of the statutory text and the statutory purpose.  Perhaps most notably, Paragraph 6—and, in particular, the catch-all provision that the FDIC invokes here—is far more open-ended than the date and place requirement at issue in *Pereira*.  Paragraph 6 requires the notice to contain "[t]he identity, personal history, business background and experience of each person by whom or on whose behalf the acquisition is made, including his material business activities and affiliations during the past five years, and a description of any material pending legal or administrative proceeding"; "[a] statement of the assets and liabilities of each [such] person . . . as of the end of the fiscal year for each of the five fiscal years immediately preceding the date of the notice, together with related statements of income and source and application of funds for each of the fiscal years then concluded"; "[t]he terms and conditions of the proposed acquisition"; "[t]he identify, source and amount of funds or other consideration used or to be sued in making the acquisition"; "[a]ny plans or proposals . . . to liquidate the bank, to sell its assets or merge it with any company or to make any other major change in its business or corporate structure or management"; "[t]he identification of any person employed, retained, or to be compensated by the acquiring party . . . to make solicitations or recommendations to stockholders for the purpose of assisting in the acquisition, and a brief description of the terms of such employment"; [c]opies

of all invitations or tenders or advertisements making a tender offer to stockholders for purchase

of their stock"; and—most significantly—"[a]ny additional relevant information in such form as

the appropriate Federal banking agency may require by regulation or by specific request in

connection any particular notice." *id.* § 1817(j)(6)(A)–(H). This type of expansive, often

indefinite, and open-ended list of required information is difficult to square with the FDIC's

contention that the list of requirements is definitional.

Even more importantly, the FDIC's theory is at odds with the statutory scheme, which

gives the banking agencies a prescribed time to act. If the Court were to adopt the FDIC's

reading of the statute, the statutory deadline would be a dead letter—or near to it. The 60 (or

180) days that Congress provided federal banking agencies to act would been meaningless, since

an agency could make request after request for additional information, prolonging the review

period for many months, if not years. And, in a case like this one, where the acquiring party and

the federal banking agency have a difference of views regarding the materiality of the "additional

. . . information" sought by the agency, the agency could deprive the acquiring party of her right

to an administrative hearing and to direct appellate court review by simply deeming the notice

"substantially incomplete" and abandoned. *See* Dkt. 23-1 at 20–21.

That leads to another significant problem with the FDIC's reading of the statute: at least

three neighboring sections of the CBCA show that Congress intended for the appropriate federal

banking agency to address "substantial completeness" during the 60-day disapproval period—

and not as a threshold requirement for commencing that period. First, the CBCA provides that

"if the [FDIC] determines that any acquiring party has not furnished all the information required

under paragraph (6)," the FDIC may "extend[]" the disapproval period. 12 U.S.C.

§ 1817(j)(1)(A). Congress, thus, contemplated that, at times, an acquiring party might submit an

incomplete notice, and, when that happens, Congress authorized the appropriate federal banking agency to "extend" the disapproval period.  That provision would make no sense, however, if Congress also contemplated that an incomplete notice—that is, a notice the omits any information required under Paragraph 6—would not start the clock the first place.  *See Extend*, Merriam-Webster's Third New International Dictionary (10th ed. 1993) ("extend" defined as "to cause to be longer").

Second, the statute also provides that the appropriate federal banking agency "shall," "[u]pon receiving any notice" under the CBCA, "conduct an investigation of the competence, experience, integrity, and financial ability" of the person seeking to acquire control of a bank, and "make an independent determination of the accuracy and *completeness* of any information described in paragraph (6)."  12 U.S.C. § 1817(j)(2)(B) (emphasis added).  That provision, however, cannot be reconciled with the FDIC's contention that a filing that omits information required under Paragraph 6 is not a "notice" at all.  The FDIC's position, in short, has it backwards.  The completeness inquiry does not determine whether a notice has been submitted, rather, the submission of the notice triggers the completeness inquiry.

Finally, the CBCA provides that the FDIC "may disapprove any proposed acquisition" if "any acquiring person neglects, fails, or refuses to furnish . . . all the information required" by the agency.  12 U.S.C. § 1817(j)(7)(E).  Congress anticipated a scenario in which, as here, a proposed acquirer "refuses" to furnish information that the agency deems necessary to its review, and it authorized the agency to *disapprove* the proposed acquisition in that circumstance.  That disapproval, in turn, permits the acquiring party to request an agency hearing "on the record" pursuant to 5 U.S.C. § 554, and, if the proposed acquisition is disapproved after the hearing, to "obtain review by the United States court of appeals in which the home office of the bank to be

acquired is located, or the United States Court of Appeals for the District of Columbia."  12 U.S.C. § 1817(j)(4)–(5).  There is no indication that Congress intended, as the FDIC suggests, to provide the appropriate banking agency with discretion to decide which of two tracks to take: to fail to accept a notice on the ground that it is incomplete, which would permit district court review under the APA, or to accept the notice and then disapprove the acquisition on the ground that the notice is incomplete, which would permit the acquiring party to seek a hearing and direct appellate court review.  Rather than leave this decision to the banking agency, Congress made the decision, and it provided that the agency should disapprove the acquisition if the notice is incomplete.

The FDIC's contention that the phrase "prior written notice of such proposed transaction" means a notice containing all or substantially all of information specified in Paragraph 6 is not only contrary to the statutory text, it is at odds with the agency's own regulations.  The definitions applicable to Part 303 of the FDIC's regulations provide that the term "notice" "means a submission notifying the FDIC that a depository institution intends to engage in or has commenced certain corporate activities or transactions."  12 C.F.R. § 303.2(w).  And, here, there is no dispute that Hurry's notice cleared that threshold; it informed the FDIC that Hurry intended to acquire 63% of the outstanding stock of the Bank of Orrick.  The FDIC responds that this definition does not apply in this case because it is "expressly modifiable by regulation[s] (*e.g.*, 12 C.F.R. § 303.86(b)) or statute."  Dkt. 24 at 14 n.3.  But, as explained above, the statutory text is entirely consistent with the regulatory definition of a "notice."  Nor does the FDIC's substantially complete regulation "modify" the definition of a "notice."  *See* 12 C.F.R. § 303.86(b).  Instead, the regulation addresses when the 60-day notice period begins to run, and even more importantly, as explained above, it does not identify what is required to satisfy the

"substantially complete" requirement.  Notably, the regulation does not specify, as the FDIC now argues, that a notice (or even a substantially complete notice) means a notice containing everything listed in Paragraph 6, including such "additional relevant information" as the agency "may require . . . by specific request in connection with any particular notice."  12 U.S.C. § 1817(j)(6)(H).  And, if the regulation said what the FDIC suggests, it would run afoul of the statutory text for the reasons discussed above.

In summary, then, the FDIC's letter decision of July 24, 2018 "returning" Hurry's March 13, 2018 notice "as incomplete," Dkt. 29-1 at 372, and its letter decision of September 19, 2018, Dkt. 29-1 at 393, closing Hurry's file as "abandoned" under 12 C.F.R. § 303.11(e) cannot be squared with the text or purpose of the CBCA.  The text makes clear that a federal banking agency may do two things when an acquiring person fails to provide it with all information that the agency deems relevant: first, it may extend the 60-day period for disapproval, 12 U.S.C. § 1817(j)(1), and second, it may disapprove the proposed acquisition, *id.* § 1817(j)(7)(E).  Limiting the banking agency's discretion in this manner also serves the statutory purpose by ensuring either that the agency acts promptly and disapproves the acquisition, which triggers the right to a hearing and appeal, or that it does nothing, which allows the acquisition to proceed.  The FDIC's reading of the statute, in contrast, would permit federal banking agencies to delay the process indefinitely while it seeks additional information, and it would prevent acquiring persons from exercising their right to a hearing and appeal where the acquiring person and the banking agency disagree about the relevance of "additional . . . information" sought by the agency, 12 U.S.C. § 1817(j)(6)(H).

That reading of the statute thus fails at *Chevron* step one, where the Court "must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 843.  In

making this determination, the Court applies the "traditional tools of statutory construction," *id.* at 843 n.9, including looking to "the text, structure, and the overall statutory scheme, as well as the problem Congress sought to solve," *Fin. Planning Assoc. v. SEC*, 482 F.3d 481, 487 (D.C. Cir. 2007), in order "to determine whether Congress has 'unambiguously foreclosed the agency's statutory interpretation.'" *Vill. of Barrington*, 636 F.3d at 659 (quoting *Catawba Cty., N.C. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009)).  Here, the CBCA unambiguously forecloses a reading of the statute that permits the federal banking agency simply to return a notice as "incomplete" when dissatisfied with the acquiring person's responses to the agency's request for additional information, as opposed to disallowing the acquisition and triggering the right to a hearing and appeal.  But, even if the Court were to conclude that the CBCA left a gap for the federal banking agencies to fill, the FDIC's decisions would fail at *Chevron* step two, where the Court must assess the reasonableness of the agency's interpretation.  467 U.S. at 843.  The FDIC would read two provisions out of the CBCA—the provision permitting the federal banking agency to "extend" the disapproval period if the acquiring party fails to furnish "all the information required under" Paragraph 6, 12 U.S.C. § 1817(j)(1), and the provision permitting the agency to disapprove a proposed acquisition if the acquiring person fails "to furnish the appropriate Federal banking agency all the information required by the . . . agency," *id.* § 1817(7)(E).  And, at the same time, it would undermine the statutory structure, which requires a federal banking agency that seeks to block an acquisition to act promptly and which provides disappointed parties with the opportunity for a prompt hearing and a direct appeal to appropriate court of appeals.  *Id.* § 1817(j)(3)–(5).  That decision is not supported by a "reasoned explanation."  *Vill. of Barrington*, 636 F.3d at 660.

In reaching this decision, the Court expresses no view on whether, under other circumstances, a federal banking agency may decline to accept a notice of proposed acquisition on the ground that it is too incomplete to start the 60-day clock.  This is not a case, for example, in which the acquiring person failed to describe the acquisition (including its key terms), to identify the acquiring party, or to sign the required certification.  To the contrary, Hurry made a good faith effort to comply with the agency's requirements by meeting with the FDIC; submitting a draft notice for the agency's review; submitting a formal notice that consisted of the FDIC's own forms and over 150 pages of exhibits; and responding to multiple requests for additional information by supplementing those materials several times.  *See* Dkt. 29 at 99–375, 381–679.  By the time the FDIC returned Hurry's notice on July 24, 2018, she had satisfied most of the agency's demands for additional information.  The sticking point involved two irrevocable trusts.  Information regarding the trusts was irrelevant, in Hurry's view, because she is merely a beneficiary, and not a trustee, and she was not relying on "any beneficial interest in the[] trusts to support her financial ability to acquire control of the [b]ank."  Dkt. 29-1 at 373.  She further argued, moreover, that "[she] does not control the trusts and . . . is not authorized to provide documentation regarding the trusts," which implicate the "privacy interests" of others.  *Id.*; *see also id.* at 296 (stating that "an irrevocable trust is the most effective way to preserve anonymity to avoid public disclosure detailing grantor's assets and distribution plans").  The FDIC disagreed and maintained that the "information is needed to complete review of . . . Hurry's competence, experience, integrity, and financial ability pursuant to 12 U.S.C. § 1817(j)."  *Id.* at 372.  Hurry's dispute with the FDIC, accordingly, was a substantive—as opposed to a ministerial—one, and it did not involve the types of information necessary to provide notice to "the appropriate State depository institution supervisory agency" or to permit public comment, as

required by the CBCA.  12 U.S.C. § 1817(j)(2).  Substantive disputes of this type are properly

resolved through the "on the record" hearing and appellate process established in the CBCA.

Contrary to the FDIC's assertion, moreover, the administrative record indicates that the

agency's "investigation" was under way while Hurry's notices were pending acceptance.  To

take just one example, the FDIC submitted the following request to Hurry on January 12, 2018,

in response to her second notice:

> Your response to question 2 [of the Interagency Biographical and Financial Report
> form] states Ms. Hurry is an owner of Investment Services Holdings Corp.,
> Stateline, Nevada. However, in response to question 4, Ms. Hurry states she does
> not own any of the investments listed below, which includes Investment Services
> Holding Corp. This entity is also identified as the sole source of income for Ms.
> Hurry. The Nevada Secretary of State database reflects Mr. John Hurry as the
> President, Secretary, Treasurer, and Director with no reference to Ms. Hurry.
> Please clarify if the source of income is to Ms. Hurry or the Hurry Family Trust.

Dkt. 29-1 at 3.  This response—which is one of many—demonstrates that the FDIC had already

begun reviewing Hurry's background, including by consulting extra-record sources, after she

submitted her notices.

The Court, accordingly, concludes that the FDIC erred in returning Hurry's March 13,

2018 notice as "incomplete" and in then closing her file on grounds of abandonment pursuant to

12 C.F.R. § 303.11(e).  By refusing to accept Hurry's notice, the FDIC acted contrary to the

CBCA in violation of the APA.  If dissatisfied with Hurry's responses to its requests for

additional information, the agency could have disallowed the acquisition.  But, had it done so,

Hurry would have been entitled to seek an "on the record" agency hearing and to appeal an

adverse decision, if any, to the appropriate court of appeals.  By repeatedly returning Hurry's

notice as "incomplete," however, the FDIC deprived Hurry of those procedural rights.

**C.     Remedy**

That leaves the question of the appropriate remedy.  "When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency."  *N. Air Cargo v. USPS*, 674 F.3d 852, 861 (D.C. Cir. 2012); *see also Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013); *Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 11 (D.D.C. 2019).  In addition to remand, "unsupported agency action normally warrants vacatur."  *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005).  Thus, the typical remedy when a plaintiff successfully challenges an agency action is to vacate and remand for the agency to reconsider the question at issue.  *See Am. Hosp. Ass'n*, 385 F. Supp. 3d at *11 ("[W]hen a plaintiff brings an APA claim 'to set aside an unlawful agency action . . . it is the prerogative of the agency to decide in the first instance how to best provide relief.'" (quoting *Donovan*, 703 F.3d at 589)).

Hurry seeks a "declaratory judgment stating that the transaction may proceed," Dkt. 23-1 at 19; Dkt. 22 at 21 (Am. Compl. ¶ 19), or, in the alternative, "an injunction compelling the FDIC to render an appropriate decision" on her proposed acquisition "without further delay," Dkt. 22 at 19 (Am. Compl. ¶ 64).  Although Hurry devotes few words to this issue in her motion for summary judgment, she argues in her reply brief that the FDIC should not get a "second bite at the apple" after it "cavalierly disregarded the pertinent provisions" in the CBCA.  Dkt. 27 at 14.  The FDIC counters that the Court should instead remand without vacatur to "allow[] [Hurry] the opportunity to resubmit her application and for the FDIC to approve or disapprove."  Dkt. 24 at 25.  In support of its position, the FDIC invokes *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993), which sets forth a test for determining when vacatur of an "inadequately supported rule" is inappropriate.  *Id.* at 150.  Under *Allied-Signal*, "[t]he

decision whether to vacate depends on [(1)] 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [(2)] the disruptive consequences of an interim change that may itself be changed.'" *Id.* at 150–51 (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir. 1990)). The FDIC rests its argument on *Allied-Signal*'s second prong, arguing that it "would be disruptive to the nation's regulatory system for an order to issue vacating the FDIC's determination and installing [Hurry] as the new owner of the Bank." Dkt. 24 at 25.

Both parties miss the point. The unlawful agency actions in this case are the FDIC's decisions returning Hurry's March 13, 2018 notice as "incomplete" and then closing her file on grounds of abandonment, and nothing in *Allied-Signal* or the APA counsels against setting *those* decisions aside. *See* 5 U.S.C. § 706(2) (directing reviewing courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "without observation of procedure required by law"). Setting those decisions aside, however, does not mean that Hurry may proceed with the proposed acquisition. It just means that the FDIC must now treat the notice as properly filed and, within the statutory period, either disapprove the acquisition or allow it to proceed. The FDIC, moreover, presumably already has the information it needs. If it believes that Hurry's notice is deficient in a material respect because she has failed to provide the requested information with respect to the irrevocable trusts, it can disapprove the acquisition, thereby triggering Hurry's right to an agency hearing. In addition, if the FDIC concludes that Hurry needs to update her notice with more current information, it may request that additional information and may, if appropriate, extend the disapproval deadline for up to an additional 120 days—providing the agency with a total of 180 days to decide whether to disapprove the acquisition. *See* 12 U.S.C. § 1817(j)(1).

This conclusion also comports with "traditional equitable principles requiring the balancing of public and private interests control the grant of declaratory or injunctive relief in federal courts." *Webster v. Doe*, 486 U.S. 592, 604–05 (1988); *see also* 33 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 8385 (2d ed. 2021) ("Like injunctive relief . . . issuance of declaratory relief [in the APA context] does implicate the equitable discretion of the courts."). The Court recognizes that Hurry has already waited almost four years for a decision on whether her acquisition may proceed. But, as Congress indicated in passing the CBCA, the public has a strong interest in ensuring that federal agencies are able investigate proposed changes in bank control for any potentially adverse consequences and disapprove them if appropriate. *See* 12 U.S.C. § 1817(j)(7); Robert Bloom, *Changes in Control of Banks*, 2 Ann. Rev. Banking L. 21, 22–25 (1983) (explaining that Congress passed the CBCA to mitigate "abuses by controlling parties," among other reasons). Equity counsels in favor of giving the FDIC an opportunity to conduct an investigation, within the timeframe prescribed in the CBCA, and, if appropriate, to disapprove Hurry's proposed acquisition. And, if it does so, equity counsels in favor of permitting Hurry to seek an agency hearing and, if that proves unsuccessful, to file an appeal. That is how the regulatory process is supposed to work, and the Court's sole interest is in ensuring that Hurry receives the process to which she is entitled under the CBCA.

Accordingly, the Court will **GRANT** Hurry's motion for summary judge in part with respect to Count II of the Amendment Complaint and will **DENY** the FDIC's cross-motion for summary judgment with respect to Count II. The Court will also vacate the FDIC's decisions returning Hurry's March 13, 2018 notice as "incomplete" and closing her file on grounds of abandonment finding. Consistent with that decision, the FDIC must—as of the date of this

decision—treat Hurry's notice as properly filed, and it must engage in the review contemplated by the CBCA.

## C.  Lawfulness of FDIC's Request for Specific Information

This leaves Count III of the Amended Complaint, which alleges that the FDIC discriminated against Hurry based on her gender and that, as a result, its decisions were arbitrary and capricious under the APA and unlawful under the Fifth Amendment of the Constitution. Dkt. 22 at 20 (Amd. Compl. ¶¶ 71–72).  The parties' briefing on this count is sparse, to say the least.  In her opening brief, Hurry devotes a single sentence to her claim of discrimination, asserting: "The agency has also failed to offer any explanation for its demand for information concerning Plaintiff's husband (as if she lacked her own independent character and resources) or its demand for confidential family trust documents."  Dkt. 23-1 at 26.  Then, in its opposition, the FDIC makes no mention of discrimination and, instead, reads Count III to allege that the agency acted arbitrarily and capriciously in seeking the trust documentation, and it then defends the agency's need to conduct "a thorough, independent investigation into the applicant's background and affiliations."  Dkt. 24 at 23.  In her opposition, Hurry responds to the FDIC's version of the argument and addresses whether the agency properly demanded information relating to the family trusts.  Dkt. 26 at 12–13.

The Court need not—and should not—resolve this dispute for three reasons.  First, to the extent Hurry ever intended to press a claim under the equal protection component of the Due Process clause, she has abandoned that argument in her briefing.  Second, to the extent she again challenges the FDIC's decisions returning her notice and treating her file as abandoned, the Court has already ruled in her favor on that question and has set aside those decisions.  Third, to the extent she asks the Court to opine on whether the FDIC may reasonably require that she

44

produce the requested trust documentation, that question should be addressed in the first instance in the administrative process.  If, on remand, the FDIC disapproves the proposed acquisition on the ground that Hurry has failed to comply with valid a Paragraph 6 request for relevant information, she can challenge that decision at her administrative hearing and, if unsuccessful there, before the appropriate court of appeals.  For now, however, the Court merely concludes that the claim is premature and that, if eventually perfected, the claim must be presented to a different court.

The Court will, accordingly, **DISMISS** Count III without prejudice as premature.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** the FDIC's motion for summary judgment as to Count I and will **DENY** Hurry's motion for summary judgment as to Count I; will **GRANT** in part and **DENY** in part Hurry's motion for summary judgment as to Count II and will **DENY** the FDIC's motion for summary judgment as to Count II; and will **DISMISS** Count III on the ground that the claim is premature.

A separate order will issue.

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date:  February 24, 2022

45